ANDREW MILLER, an infant by his next friend, ANNA MAY MILLER, respondent,

*v.*

HELEN MILLER et al., appellants.

[Submitted February 15th, 1946. Decided May 3d, 1946.]

On appeal from a decree of the Court of Chancery advised by Vice-Chancellor Bigelow, who filed the following opinion:

"Andrew Miller, an infant seven years old, sues by his next friend to set aside two conveyances made by his grandmother, Mrs. Elizabeth Miller, now deceased. Complainant and the

defendant Helen Miller are the only heirs and next of kin of deceased.

"In 1922, Mrs. Miller contracted senile dementia, a disease caused by a hardening of the arteries that supply the brain. She was then living with her husband and their two children Helen and Andrew, at the family home in Nutley. Mr. Miller asked his daughter, who was twenty years old and employed at an excellent wage, to give up her employment so that she might keep house and take care of her mother. This she did. Mr. Miller died after an illness of several months, in November, 1936. Andrew married the following summer and, after a few months at his mother's home, he and his wife established a home of their own. Their child, the complainant, was born August 10th, 1938. Andrew, who was a fireman, lost his life at a fire, November, 1941. The following month, Mrs. Miller conveyed the family homestead to Helen. In April, 1942, in consideration of $1,000, she executed a release of her interest in the estate of her father, Henry Selzer, deceased. A year later, at the age of seventy-three, she died of a cerebral hemorrhage.

"Mrs. Miller was a patient at the Essex County Hospital for the Insane throughout the year 1923. She was released from the hospital and allowed to return to her home, not because she was cured, but because she was not violent and further hospitalization was unlikely to improve her condition. She suffered from senile dementia for the rest of her life. For a great part of the time, her condition was such that she would sit in a rigid attitude, speaking to no one and answering not even the simplest question. Perhaps a third of the time she seemed quite normal; she would converse, though with some hesitation; with her daughter she would call on neighbors or go to the moving picture theatres. She did a good deal of sewing and knitting at the instance of her daughter.

"As long as Andrew lived, he aided in the support of his parents' household. Before his marriage in 1937, we can assume that he made a larger financial contribution than his sister. After he married and established his own home, he contributed $5 a week. Helen not only did the housework

and nursed her mother, but by sewing and part-time work outside, managed to provide food and other necessaries, and to keep the home going. Upon Andrew's death, his widow became entitled to a pension of $83 a month for life and to workmen's compensation of $19 a week until their child, the complainant, shall become nine years old in 1947, when the amount will be reduced, and the compensation will stop entirely at his sixteenth birthday.

"We now come to the execution of the deed. The Millers were members of St. Mary's Church in Nutley. Their pastor, Father Owens, well knew the family situation and, when Andrew died, he realized Mrs. Miller and Helen must have financial help. And he was convinced that Helen, in simple justice, should have the property. He talked over both aspects of the matter with her and with the officers of the St. Vincent de Paul Society, a charitable organization of the parish. Father Owens does not recall having discussed with Mrs. Miller either pecuniary aid or the disposition of the property. The upshot was that the Society did help to the extent of $400 or so in the remaining year and one-half of Mrs. Miller's life. And the Society, or the pastor, also asked Mr. William Andrew Smith, a very reliable member of the bar, to call on Mrs. Miller. He did so and was admitted to the house by Helen, but he talked with Mrs. Miller alone. Without any prompting, she told him that because Helen had taken care of her for years, she wanted to give her the house. Mr. Smith did not inquire into Mrs. Miller's financial condition or advise her as to the wisdom of the proposed transfer. He merely took her instructions. A week or so later, having drawn the deed, he and a friend, Mr. Curtis, called again, and Mrs. Miller executed and acknowledged the conveyance. On taking her acknowledgment, Mr. Smith explained in a formal way the contents of the document, that is, that it was a deed conveying to her daughter the homestead. Helen was present in the room on this occasion, but merely asked her mother if she knew what she was signing.

"The conveyance and the release given the following year are attacked, first, on the ground that Mrs. Miller was mentally incompetent. The test is whether she possessed suf-

ficient ability at the times she acted, to understand in a reasonable manner the nature and effect of the conveyance and the release. *Leick* v. *Pozniak, 135 N. J. Eq. 67.* It is clear that on both occasions Mrs. Miller seemed normal. Probably the dementia made her mind more sluggish and her understanding less clear. But both Mr. Smith and Mr. Curtis, as well as the parties more directly concerned, were confident she knew what she was doing, and the evidence of what was said and done leads me to the same conclusion. Mrs. Miller had sufficient capacity to act, but her mental state requires the court to proceed with utmost caution when the case is considered from the angle of undue influence and the like.

"The rules governing the conveyance of the homestead are well established. In a transaction between persons occupying a confidential relation to each other, where property is conveyed to the dominant one, he has the burden to show affirmatively that no deception was practiced; no undue influence used; the transaction was fair, open and voluntary, and that it was well understood by the transferor. *In re Fulper, 99 N. J. Eq. 293; Peppler* v. *Roffe, 122 N. J. Eq. 510.* The relationship between Mrs. Miller and her daughter was highly confidential; Helen was dominant; her mother was entirely dependent on her.

"Despite the fact that no consideration was given for the property, the transaction was fair in the sense that a gift of the house to Helen (testamentary, if not a present gift), was normal and appropriate. Mrs. Miller's mental condition was such that a devise would have invited attack; probably for this reason a present conveyance was the method chosen. Mrs. Miller's daughter-in-law and her child, the complainant, had an income of $2,000 a year, while Helen had nothing. Helen had foregone marriage and the making of a home for herself in order to care for her parents. She deserved to get the house. I am favorably impressed by her failure to claim that she took care of her mother because of any promised reward, or that she agreed to continue the support of her mother as a consideration for the conveyance. Mrs. Miller made the deed without exacting any promise, relying on her daughter's devotion. And her reliance was well placed, for

her daughter did continue to care for her thereafter as she had in the past.

"But even if the conveyance was fair, it will be set aside unless it was voluntary. The presumption is that Mrs. Miller did not wish to make the conveyance; that she was urged on by her daughter until her reluctance was overcome. The testimony offered to rebut this presumption is unsatisfactory. Helen denies that she asked her mother to make the conveyance, but she must at least have told her that Father Owens thought Helen should have the property and that a lawyer was coming to see her about it. Certainly someone prepared the way for Mr. Smith. But we have no evidence at all of what was said or done to induce Mrs. Miller to act.

"There is another rule which is applicable. When, added to the circumstances already mentioned, it appears that the transfer was improvident, it will be set aside unless it is shown that the donor had competent, independent advice. *Croker* v. *Clegg, 123 N. J. Eq. 332; Alpaugh* v. *Alpaugh, 135 N. J. Eq. 200.* At the time of the conveyance, Mrs. Miller was over seventy years old, unable to support herself. Her only assets were her home and her interest in the estate of her father. Her home was worth between $3,000 and $4,000. Her interest in her father's estate was worth about $1,000, and consisted of an undivided one-fourth part of a house and lot in Bergen Street, Newark. The conveyance to the daughter was improvident in a financial sense. I add the qualifying phrase because undoubtedly Mrs. Miller's chief resource was the devotion of her daughter, so that, in fact, the care which Mrs. Miller received after the transfer was just as good as that which she had received before. She suffered not at all as a result of the gift. But the rule which I have mentioned and which governs this case concerns tangible assets and enforceable obligations only. A transaction is considered improvident if it diminishes already inadequate means of support to which the transferor can look as a matter of legal right.

"It does not appear that Mrs. Miller received any advice in the transaction. The advice which the law requires is not a mere statement of the operation of the deed but is a calling

to the mind of the transferor of the probably or possible effect upon her of the transaction and a counselling with her as to whether or not she should make the gift. The transfer must be set aside, both because of lack of independent advice and because the inference of undue influence has not been overcome.

"The other transaction is in a different category. Mrs. Miller had a sister, Mrs. Rousch, living in Newark, who used to call on her from time to time. In the winter of 1942, when Mrs. Miller was very sick, she told Mrs. Rousch that she wanted very much to get her share of their father's estate; that she might have to go to the hospital but she had no money for any such expense. The members of the family generally considered that each of the four shares of the estate was worth $1,000, and that I find to be a fair value. Mrs. Rousch agreed to advance this sum in settlement of Mrs. Miller's interest in the estate. It was the idea that upon this payment, the estate would belong solely to the other three children of Mr. Selzer, and that when the property should be sold or divided among them, Mrs. Rousch would be reimbursed the $1,000. To effect this, Mrs. Miller executed a release to her brother as executor. The check for $1,000 was given to Helen rather than her mother because the latter was sick in bed and Helen was taking care of everything. She paid out the last $515 for her mother's funeral expense; the rest of the money was spent in dribblets during a period of a little over a year for food, medicines, and other necessary expenses. It clearly appears that this transaction was fair, voluntary, provident, and in all respects proper. Helen has sufficiently accounted for the money. The transaction will not be disturbed.

"Mrs. Miller's sisters and brother counter-claim for relief. By the will of their father, the property on Bergen Street was devised to the four children. subject to a power of sale which was given to the executor. They fear that the release executed by Mrs. Miller was not effective to transfer to them her interest in the land, and they pray for appropriate relief. They should have it.

"No costs to any of the parties."

*Messrs. Gilhooly & Yauch (Edward J. Gilhooly,* of counsel), for the appellants.

*Mr. Benjamin S. Appel,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion of Vice-Chancellor Bigelow filed in the Court of Chancery.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, OLIPHANT, WELLS, RAFFERTY, DILL, McGEEHAN, JJ. 11.

*For reversal*—None.