On appeal from a decree of the former Court of Chancery advised by Vice-Chancellor Bigelow, who filed the following opinion:
"Complainant is 81 years old, unable to read or write, slightly paralyzed. Until early in 1945, he lived in a little house *Page 525 
that he owned at 176 Bloomfield Avenue, Bloomfield. His wife took care of him, but she died January 20, 1945, and, in his condition, he could not live alone. He wanted, however, to continue in his own home, and hoped one of his five children would come there to live, but none was willing. The children reluctantly arranged among themselves that their father would stay with them in turn, three months with each. First he went to Michael's, but after less than a month, there was trouble. The old man found the house too cold, and Michael was unwilling to have him stay longer, so he went on to Jerry. But first there was a family conference at which one of the sons-in-law, Mabaldi, produced a sum of money belonging to complainant and turned it over to defendant, Fred Capozzi, and thus arises the first matter in dispute. Fred and Jerry say the sum was $884.22, while Mr. and Mrs. Mabaldi and Michael say it was $300 more. A memorandum which accompanied the money, lends some support to defendant, and I find in his favor on this issue. Complainant's house furnishings were sold after he left his own home, and the proceeds, $157.75, came to Fred's hands. Fred also collected the rent for complainant's house, $35 a month, and for a garage and little store on the same lot, $45. He admits receipt of $285 to the end of June.
"On June 7, 1947, took place the transaction which is the principal object of attack-the conveyance of the Bloomfield Avenue property to Fred Capozzi. Some days earlier, at the direction of his brother Jerry, the deed had been drawn. Then, on June 7, Emanuel N. Silberner, a lawyer, bringing the deed with him, called to take complainant's acknowledgment. The nature of the instrument was explained so that complainant fully understood it. He said he was selling the property to Fred for $3,000 because `I got to live.' In explanation, I may note that two or three weeks earlier, Jerry's wife said if he continued to stay in her home, he would have to pay $25 a week. Complainant consented. `I had to', he says. `If I did not pay, then where would I go?' On June 7, Fred was holding about $1,100 belonging to his father, which, added to the net rents to accrue, would keep the old man about 70 weeks-barring *Page 526 
unusual medical expenses. Whether he understood this, does not affirmatively appear.
"According to Jerry and Fred, the sale had been agreed upon a week before the deed was signed. Complainant offered to give the property to Jerry, if complainant could live there and Jerry and his wife would make their home there. When they refused, complainant said he would have to dispose of the property; he bargained with Fred, first asking $4,000. Fred said the buildings were in bad shape; he recalled that in the 1920s, he had taken care of his father for five years and should have special consideration on that score. Fred also says he promised, in the event of the sale, to see that his father was well taken care of as long as he lived. `I will not let you down.' So the old man agreed.
"Aside from the cash in Fred's possession, this property was complainant's only asset. It was worth between $4,000 and $9,300, the extremes of three appraisals. One Frank Boyd had offerred Fred $6,000 for it recently. Complainant was aware of the offer.
"No consideration was paid at the time of execution of the deed. Nearly two weeks later, June 19, the two younger men took their father to a bank where Fred had an account. His check for $3,000 was certified; complainant's mark on the back was witnessed by an officer of the bank, and the check was cashed. Jerry says the money was then handed to him for safekeeping and that he has kept it, or what is left of it, in his home. The other brother, Michael, and his sisters learned of the conveyance in July and `raised a big rumpus.'
"Complainant lived with Jerry or Fred until March, 1947, when, his physical condition being worse, he was sent first to Ivy Hill for a week, and then to a nursing home. There he remained until June 23, when the Mabaldis took him home with them. Suit was instituted about that time.
"I have paid little regard to complainant's own testimony. His memory is very poor, and even when he does remember, his testimony was not worth much, because of his great fear that he might admit something harmful to his case. *Page 527 
"The defendants Fred and Jerry have co-operated with each other throughout; they have been as one party. The relation between them and their father was one of confidence, and they were the dominant party; — the complainant, old, broken in health, unable to care for himself; they in the vigor of their prime. The law is settled that they cannot retain the benefit of the transaction unless they have overcome the presumption of undue influence, and unless the transaction was, under all the circumstances, fair to complainant. In re Fulper, 99 N.J. Eq. 293, 302; Cluzel v.Brown, 133 N.J. Eq. 156; Miller v. Miller, 138 N.J. Eq. 225.
"It is evident that complainant thought he was under a necessity to sell. Mr. Silberner testified that complainant explained the sale with, `I got to live', and Jerry contributed that complainant had said he would have to dispose of the property. Actually, no sale was then necessary. Complainant had the money to pay the $25 a week board for more than a year, or rather, Fred had it. Fred has not shown that this important fact was brought to complainant's attention, or was understood by him. In my estimate that the money already in hand, plus the rents, would have kept complainant 70 weeks, I have figured board at $25, other personal expenses $2.50, and taxes and land expenses $7.00 a week. Upon the sale, complainant lost the rents and was relieved of the land expenses, and on the basis used in the first calculation, he had, with the price of $3,000, enough to keep him 149 weeks, a gain of 79 weeks.
"Fred testified that as part of the transaction, he agreed to take care of complainant for life. Jerry does not corroborate him; neither does Mr. Silberner. And Fred's answer says nothing of such a promise. I find that such an agreement was not part of the consideration for the land; the only consideration agreed upon was $3,000, and this was never paid. The certified check was only `for the record'; it was not an instrument for putting the money within the control of complainant.
"A circumstance not without significance is that the proposed conveyance was kept secret from complainant's other children until after it was completed. *Page 528 
"The sale for only half the value of the land, was improvident; it seriously depleted complainant's already insufficient means. Complainant had no independent advice — no advice at all.
"For these reasons, the conveyance will have to be set aside.
"An account will have to be taken unless the parties can agree on the figures. Defendants should be charged with $955.13 on hand July 1, 1945, as shown in Exhibit D-5, plus $25, lawyer's fee disallowed, plus rents thereafter collected. They may be credited with disbursements of $881.42, shown in D-5, plus board at $25 a week from May 17, 1945, to March 6, 1947, $2,350, plus real estate expenses from July 1, 1945."
The decree appealed from will be affirmed for the reasons expressed in the opinion of Vice Chancellor Bigelow in the former Court of Chancery.
For affirmance: Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON — 6.
For reversal: None. *Page 529