2002 OK 90

**In the Matter of the ESTATE OF Laura Edna HOLCOMB, Deceased.**

**Marcus Holcomb et al., Appellants,**

v.

**Heidi Carter Drennan, Personal Representative of the Estate of Lela Elaine Carter, Deceased, Appellee.**

No. 93,653.

Supreme Court of Oklahoma.

Nov. 19, 2002.

Rehearing Denied Jan. 28, 2003.

Marcus Holcomb, Holcomb & Harkins, Buffalo, OK, Appellant pro se.

David A. Cheek and Joel H. McNatt, McKinney & Stringer, P.C., Oklahoma City, OK, for Appellants, Laura Grace McNatt, Keith Holcomb and Murray Holcomb.

Glenn A. Devoll and Julia C. Rieman, Gungoll, Jackson, Collins, Box & Devoll, P.C., Enid, OK, for Appellee, Heidi Carter Drennan.

OPALA, J.

¶ 1 The dispositive questions tendered for certiorari are: (1) Is the district court's finding that the decedent possessed testamentary capacity clearly contrary to the weight of the evidence? and (2) Is the district court's finding that the decedent's will was not the

product of undue influence clearly contrary to the weight of the evidence? We answer both questions in the negative.[1]

## I

## ANATOMY OF LITIGATION

¶2 Laura Edna Holcomb (Mrs. Holcomb) died on 13 May 1995 at the age of 96. She had three living children at the time of her death, Lela Elaine Carter (Elaine), Murray Marcus Holcomb (Marc), and Laura Grace McNatt (Laura Grace). Another son, William Maynard Holcomb (Bill), predeceased her. On or about 15 June 1990, while residing in Buffalo, Harper County, Oklahoma, Mrs. Holcomb suffered a debilitating stroke. For reasons that were not satisfactorily explained, she was not taken to the hospital, but was instead taken by Elaine to Elaine's home in Woodward where she lived until her death in 1995.

¶3 On 29 June 1990, approximately two weeks after suffering the stroke, Mrs. Holcomb executed a will which divided her estate, other than some mineral interests, into fifths. Mrs. Holcomb's four children were each to receive one-fifth and Elaine's daughter, Talley, was to receive one-fifth. Talley was also bequeathed the mineral interests. On that same day, Mrs. Holcomb was taken to the emergency room of the hospital in Liberal, Kansas. She remained hospitalized there and in Kansas City, Missouri, for approximately two months. She then returned to Elaine's home in Woodward.

¶4 On 21 August 1992, after the death of her son, Bill, Mrs. Holcomb executed a second will, which increased Elaine's share of the estate to two-fifths. The mineral interests were again bequeathed to Elaine's daughter, Talley. On the same date, Mrs. Holcomb, having inherited $80,000 upon the death of a relative, assigned that inheritance to Elaine and her elder daughter, Heidi Carter Drennan (Heidi), in equal shares.

¶5 On 14 February 1995, approximately three months before her death, Mrs. Holcomb executed a third will leaving her entire estate to Elaine and, in the event Elaine were to predecease her, to Elaine's heirs.

¶6 After her mother's death, Elaine petitioned the District Court, Woodward County, to admit the 1995 will to probate. Marc, Laura Grace, and Bill's two sons, Murray Allen Holcomb and Warren Keith Holcomb (contestants), challenged the will's admission on the grounds of (1) improper venue, (2) lack of testamentary capacity, and (3) undue influence. Prior to the trial of this cause, Elaine died. Heidi was appointed personal representative of her mother's estate and is now the proponent of her grandmother's will (the will proponent). The district court found against contestants on all issues and ordered the will admitted to probate. Contestants appealed.

¶7 The Court of Civil Appeals, Division II (COCA), reversed, holding that the district court's finding on the issue of undue influence was clearly contrary to the weight of

1. Contestants also challenged on appeal the district court's ruling that venue was properly laid in Woodward County. The Court of Civil Appeals' opinion addressed the issue and affirmed the lower court's decision. Contestants, who secured a reversal of the lower court's order on other grounds, did not timely file their own certiorari petition objecting to the venue issue's appellate disposition. Our pronouncement in *Hough v. Leonard*, 1993 OK 112, 867 P.2d 438, teaches that the prevailing party in the Court of Civil Appeals may obtain this court's review of issues properly raised and briefed on appeal, *but not addressed by the intermediate appellate court*, without filing a petition for certiorari. *Id.* at ¶18, at 446. *Hough* does not teach that a certiorari respondent may, without filing a counterpetition, seek to enlarge his (or her) own rights or diminish those declared by the decision of the intermediate appellate court in favor of the cer-

tiorari petitioner. A certiorari respondent who brings no counter-petition stands in a posture restricted to the defense of the relief granted. Contestants did not file a counter-petition of their own within the time allotted for a certiorari petition's timely filing. They may nevertheless have expected our re-consideration of the venue issue in light of a statement in at least one of their responsive filings that their earlier appellate arguments are to be considered incorporated by reference. If by this contestants hoped to repress the venue issue, they did not succeed. Without a timely-filed request for review of the venue issue, it is now beyond our reviewing cognizance. *An issue tendered and decided on appeal but not reasserted by petition or counter-petition for certiorari stands abandoned.* See the provisions of Rule 1.180(b), Supreme Court Rules, 12 O.S.2001, Ch.15, App. 1.

the evidence. We granted certiorari on the will proponent's petition and now vacate COCA's opinion and affirm the district court's probate order.

## II

### STANDARD OF REVIEW

 ¶ 8 Probate proceedings are of equitable cognizance.[2] While an appellate court will examine and weigh the record proof, it must abide by the law's presumption that the *nisi prius* decision is legally correct and cannot be disturbed unless found to be clearly contrary to the weight of the evidence or to some governing principle of law.[3] Because a trial judge has an opportunity that is unavailable to an appellate court to observe the demeanor and conduct of the witnesses, deference should be accorded on review to the trial tribunal's resolution of conflicting testimony.[4] If legally correct, a district court's ruling will not be reversed because of its faulty reasoning, erroneous finding of fact or its consideration of an immaterial issue.[5] When a will is offered for probate, the factum of the will—i.e., (a) whether the will has been executed with the requisite statutory formalities, (b) whether the maker was competent to make a will at the time, and (c) whether the will was the product of undue

influence, fraud or duress—becomes the singular concern of the court.[6] The emphasis of the judicial process from beginning to end is to discern and effectuate the decedent's dispositive intent.[7]

## III

### THE DISTRICT COURT'S RULING THAT MRS. HOLCOMB POSSESSED TESTAMENTARY CAPACITY IS NOT CLEARLY CONTRARY TO THE WEIGHT OF THE EVIDENCE.

 ¶ 9 Testamentary capacity exists when a person possesses, in a general way, the ability to appreciate the character and extent of the devised property, understands the nature of the relationship between himself and the natural objects of his bounty, and apprehends the nature and effect of the testamentary act.[8] Whether one possesses testamentary capacity is a question of fact.[9] *The burden of persuasion that a will maker lacked testamentary capacity rests upon the will contestant.*[10] In adjudging a decedent's testamentary capacity, it is appropriate for the trial tribunal to consider evidence of the testator's mental capacity, appearance, conduct, habits and conversation both before and after the will's execution to the extent these

2. *In re Estate of Sneed,* 1998 OK 8, ¶ 8, 953 P.2d 1111, 1115; *In re Estate of Lacy,* 1967 OK 123, ¶ 6, 431 P.2d 366, 368.

3. *In re Estate of Maheras,* 1995 OK 40, ¶ 7, 897 P.2d 268, 271–72; *In re Estate of Eversole,* 1994 OK 114, ¶ 7, 885 P.2d 657, 661. The phrase "weight of the evidence" does not refer to a numerical calculation of either the number of witnesses or the quantity of evidence for or against the existence of a fact. It refers instead to the power of the evidence to persuade. The quality and plausibility of the evidence as well as other intangible factors enter into that assessment. *See Braunschweiger v. Waits,* 179 Pa. 47, 36 A. 155, 156 (1897) ("The weight of evidence is not a question of mathematics, but depends on its effect in inducing belief. It often happens that one witness, standing uncorroborated, may tell a story so natural and reasonable in its character, and in a manner so sincere and honest, as to command belief, although several witnesses of equal apparent respectability may contradict him. The manner and appearance of the witness, the character of his story, and its inherent probability, may be such as to lead a jury to believe his testimony, and accept it as the truth of the transaction to which it relates. The ques-

tion for the jury is not, on which side are the witnesses most numerous, but what testimony do you believe?"). *See also Smith v. Moroney,* 79 Ariz. 35, 282 P.2d 470, 472 (1955).

4. *In re Estate of Gerard,* 1995 OK 144, ¶ 13, 911 P.2d 266, 269; *Prudential Fire Ins. Co. v. Stanley,* 1942 OK 393, ¶ 15, 131 P.2d 88, 90.

5. *In re Estate of Maheras, supra* note 3, at ¶ 7, at 272.

6. *In re Estate of Sneed, supra* note 2, at ¶ 8, at 1115; *In re Heitholt's Estate,* 1950 OK 6, ¶ 10, 213 P.2d 865, 867.

7. *In re Estate of Sneed, supra* note 2, at ¶ 8, at 1115.

8. *In re Estate of Gerard, supra* note 4, at ¶ 12, at 269; *In re Estate of Carano,* 1994 OK 15, ¶ 14, 868 P.2d 699, 703.

9. *In re Estate of Sneed, supra* note 2, at ¶ 9, at 1115.

10. *Id.*

factors are relevant to the maker's mental condition at the time the will was executed.[11]

¶ 10 A great amount of conflicting evidence germane to Mrs. Holcomb's testamentary capacity was introduced. Witnesses called by contestants included the contestants themselves, Marc's children, Laura Grace's daughter, a home nursing supervisor, and Mrs. Holcomb's first post-stroke physician. These witnesses cumulatively testified that by the date of the execution of the will in question, Mrs. Holcomb was mentally incompetent, was speaking of deceased friends and relatives, including her son, Bill, as if they were alive, was receiving mind-altering drugs, was exhibiting increasing difficulty in sustaining a coherent conversation, did not consistently recognize or respond to them, and lacked the capacity to know what property she owned.

¶ 11 The proponent challenged this evidence in every respect. She obtained from Mrs. Holcomb's first post-stroke physician an admission that, although he considered Mrs. Holcomb incompetent, another physician could have considered her "alert" and could have believed her to be competent. Mrs. Holcomb's second post-stroke physician, who treated her from 1993 until her death in 1995, testified that although his patient continued to decline physically, she remained "bright" and capable of making her own decisions. He had no doubt that she remained competent up to the time of her death.

¶ 12 One of Mrs. Holcomb's nephews visited her in the fall of 1994 and the spring of 1995. He described his aunt as "sharp as a tack." He testified that his aunt asked about his children and, much to his surprise, remembered his son's name even though she had seen the child only twice in her life. He remembered commenting to his mother later that Mrs. Holcomb was still capable of playing bridge. He stood to gain nothing from the will and did not appear to be especially close to his relatives on either side of the case.

¶ 13 A neighbor who frequently stopped by the house to visit[12] testified that Mrs. Holcomb was an active participant in their conversations. The neighbor had to watch the news before her visits because Mrs. Holcomb "knew more about what was going on than I did a lot of times." She also testified that Mrs. Holcomb knew who her children were.

¶ 14 Mrs. Holcomb's hired daily caregiver testified that Mrs. Holcomb was alert and carried on intelligent conversations with her throughout the five years she attended to her. Mrs. Holcomb knew who her children were and, when talking about them, she identified each by name. She liked to talk about politics. In the caregiver's opinion, Mrs. Holcomb's mind was still sharp in 1994 and 1995.

¶ 15 Each of the parties who participated in the execution of the 1995 will testified. One of the witnesses testified that Mrs. Holcomb was alert, conversed with her attorney in complete sentences, and seemed to comprehend what was taking place. She watched people as they moved about in the room and replied to whomever spoke to her. Mrs. Holcomb's attorney testified that she and she alone provided him with the dispositive provisions of the 1995 will. She was able to offer him a reasonable explanation for devising her entire estate to Elaine. He testified that Mrs. Holcomb knew who her children were and understood in a general way what property she owned. He had no doubt that she possessed the requisite competence to execute the will. The neighbor who frequently visited Mrs. Holcomb also participated in the execution of the 1995 will as the decedent's proxy signer. She testified that she stayed after the will's execution and visited with Mrs. Holcomb for about thirty minutes. During their conversation Mrs. Holcomb told her she had left everything to Elaine because she was worried about Elaine's financial security.

¶ 16 The voluminous medical records included as exhibits did little to shed light on Mrs. Holcomb's mental condition as it relates to testamentary capacity. Their focus was on her physical ailments and the treatment being employed to relieve her symptoms. Notations on nursing reports regarding certain aspects of Mrs. Holcomb's mental condition were not consistently recorded and were not by themselves sufficient indicators that she did or did not possess the knowledge and understanding necessary for testamentary capacity.

¶ 17 Although the testimony on both sides of the issue was compelling, the trial judge

---

**11.** *Id.; In re Estate of Gerard, supra* note 4, at ¶ 12, at 269.

**12.** The neighbor was also the wife of the partner of the attorney who drafted the will in contest.

had the benefit of observing the witnesses as they testified. Deference is owed to the trial court's determination of the witnesses' relative credibility in the face of irreconcilable conflict, contradiction, and potential bias.[13] Where the *nisi prius* decision is not clearly contrary to the weight of the evidence, it must be affirmed.

## IV

### THE DISTRICT COURT'S RULING AGAINST CONTESTANTS ON THE ISSUE OF UNDUE INFLUENCE IS NOT CLEARLY CONTRARY TO THE WEIGHT OF THE EVIDENCE

¶ 18 The district court may deny probate of a will found to be tainted by undue influence.[14] The burden of persuasion that a will has been so tainted rests on the contestant.[15] Ordinarily, the contestant alleging undue influence also bears the burden of producing evidence,[16] but upon a finding by the trial court (a) that a confidential relationship existed between the will maker and another, stronger party and (b) that the stronger party actively assisted in the preparation or procurement of the will, a *rebuttable presumption of undue influence at once arises that shifts to the will proponent the burden of producing evidence.*[17] The effect of this alteration in the allocation of the burden of proof is to shift the risk of an adverse decision from the contestant to the

13. *In re Estate of Gerard, supra* note 4, at ¶ 18, at 270.

14. *In re Estate of Maheras, supra* note 3, at ¶ 8, at 272. The pertinent terms of 84 O.S.2001 § 43 are:

"A will or part of a will procured to be made by duress, menace, fraud or *undue influence,* may be denied probate, and a revocation procured by the same means, may be declared void." [emphasis added.]

15. *In re Estate of Maheras,* supra note 3, at ¶ 8, at 272.

16. *See* L. WHINERY, OKLAHOMA EVIDENCE, §§ 8.03 and 8.04 (2d ed.1994). *See also* the UNIFORM PROBATE CODE § 3–407 (11th ed.1993) which states:

"Contestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake or revocation. Parties have the ultimate burden of persuasion as to matters with respect to which they have the initial burden of proof."

17. *In re Estate of Maheras, supra* note 3, at ¶ 9, at 273. A presumption is a rule of law that alters the usual rules governing the allocation of the burden of proof (consisting of the burden of producing evidence and the burden of persuasion). WHINERY, *supra* note 16 at § 9.19. A presumption causes the existence of a fact (the presumed fact) to be assumed when another fact (the basic fact) is established, unless the party against whom the presumption operates presents evidence to the degree of proof required by law that the presumed fact does not exist. *Id.* The existence of a given presumption and that presumption's basic fact underpinnings are deter-mined by statute or judicial decision. *Id.* at § 9.01, § 9.02. The procedural effect of a presumption is governed by Article III of the Oklahoma Evidence Code, 12 O.S.2001 § 2301 *et seq.* The Code applies in all "civil proceedings, conducted by or under the supervision of a court, in which evidence is produced." 12 O.S.2001 § 2103. With the enactment of the Oklahoma Pleading Code in 1984, 12 O.S.2001 §§ 2001 *et seq.,* the legislature recognized only "one form of action to be known as 'civil action' ". *See* 12 O.S.2001 § 2002. Special proceedings such as probate ceased at that time to form a separate litigation class. *See* 12 O.S.1981 §§ 3–6, repealed by Laws 1984, c. 164, § 32, eff. Nov. 1, 1984. Although probate continues to operate under a separate, statutory *procedural* track, it is nevertheless a civil action or proceeding which is subject to the Evidence Code. The provisions of the Code governing the effect of presumptions in civil actions are found at 12 O.S.2001 § 2303. They state:

"Except where otherwise provided by law, when the basic fact of a presumption has been established as provided in Section 302 of this Code [12 O.S.2001 § 2302]:

1. If the basic fact has any probative value of the existence of the presumed fact, the presumed fact shall be assumed to exist and the burden of persuading the trier of fact of the nonexistence of the presumed fact rests on the party against whom the presumption operates; or

2. If the basic fact does not have any probative value of the existence of the presumed fact, the presumed fact is disregarded when the party against whom the presumption operates introduces evidence which would support a

will proponent.[18] If the will proponent then introduces *evidence which would support a finding* that undue influence was not brought to bear against the will maker, the presumption disappears and the trial court must determine the existence or nonexistence of undue influence on the basis of the evidence actually adduced directly on the issue.[19] If the will proponent fails to introduce the requisite quantum of evidence, the court must direct a verdict for the contestant.[20]

¶ 19 In determining whether a contestant's evidence establishes the basic facts that give rise to the presumption of undue influence, consideration should be given to the following non-exclusive list of factors: (1) whether the alleged influencer was or was not a natural object of the maker's bounty; (2) whether the alleged influencer was a trusted or confidential advisor or agent of the will's maker; (3) whether the alleged influencer was present and/or active in the procurement or preparation of the testamentary instrument; (4) whether the will's maker was of advanced age or impaired faculties; and (5) whether independent and disinterested advice regarding the testamentary disposition was given to its maker.[21]

¶ 20 Whether the basic facts of the presumption of undue influence have been satisfactorily established is a preliminary question of fact to be decided by the trial court.[22] In this case, finding that Elaine was not active in the procurement or preparation

of her mother's will, the trial court did not implement the presumption and therefore did not shift the burden of going forward with the evidence to the will proponent. Contestants argue that this finding was erroneous and wrongly denied them the presumption's procedural benefit. They argue that had the court implemented the presumption, it would have been compelled to find the issue of undue influence for them because the will proponent's rebuttal evidence was not sufficient to support a finding of the nonexistence of undue influence.

¶ 21 For the reasons set forth below, we agree that the presumption of undue influence was contestants' due, but hold that the will proponent's proof was sufficient to rebut the presumption. Hence, while its evidentiary methodology was flawed, the district court ultimately decided the issue of undue influence from a correct procedural standpoint, i.e. "as if no presumption had been operable in the case."[23] We, too, have examined and weighed the record proof on that basis and cannot say that the district court's decision against contestants is clearly contrary to the weight of the evidence.

**A.**

**Contestants Established the Basic Facts of the Presumption**

¶ 22 First, to invoke the presumption a contestant must establish the ex-

finding of the nonexistence of the presumed fact and the existence of the fact otherwise presumed is then determined from the evidence in the same manner as *if no presumption had been operable in the case.*
Because the basic facts of the presumption of undue influence *are not probative of the ultimate fact of undue influence,* the presumption falls into the second category of the statute, shifting only the burden of producing evidence.

18. WHINERY, *supra* note 16 at § 9.21.

19. *Id. See* the provisions of 12 O.S.2001 § 2303(2), *supra* note 17.

20. WHINERY, *supra* note 16 at § 9.21.

21. *Maheras, supra* note 3, at ¶ 8, at 272–73.

22. Where a presumption shifts only the burden of producing evidence, the existence of its basic fact or facts is a preliminary question of fact to

be decided by the court relative to its duty to allocate the burden of producing evidence. WHINERY, *supra* note 16 at § 9.05. *See* the terms of 12 O.S.2001 § 2105(A), which provide:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection B of this section."

The finding of fact necessary to make a burden-of-production-shifting presumption operative is a preliminary question of the admissibility of evidence. This is so because the basic fact that causes the ultimate fact to be assumed is not probative of the ultimate fact and would hence not be admissible in evidence absent the presumption.

23. *See* the provisions of 12 O.S.2001 § 2303(2), *supra* note 17.

istence of a confidential relationship between the will maker and another, stronger party. A confidential relationship is a fiduciary relationship and exists whenever trust and confidence are placed by one person in the integrity and fidelity of another.[24] The record contains ample proof that a confidential relationship existed between Elaine and her mother. Mrs. Holcomb appointed Elaine as her attorney in fact as early as 1972 and gave Elaine check-writing privileges on her bank account. After her 1990 stroke, Mrs. Hol-comb moved to Elaine's house in Woodward where Elaine became her mother's primary caretaker, providing directly or indirectly for her mother's physical needs and taking care of her personal, legal, and financial affairs. The record clearly shows that this relationship continued until Mrs. Holcomb's death in May 1995.

¶ 23 Second, a contestant must establish that the stronger party participated in the procurement or preparation of the decedent's will.[25] The participation that will taint a will

---

24. *In re Estate of Maheras, supra* note 3, at ¶ 8, n. 10, at 272, n. 10; *Fipps v. Stidham*, 1935 OK 855, ¶¶ 17–18, 50 P.2d 680, 683. *See also In re Estate of Beal*, 1989 OK 23, ¶ 15, 769 P.2d 150, 155, in which the court quoted with approval the definition of "confidential relation" found in *In re Null's Estate*, 302 Pa. 64, 153 A. 137, 139 (1930), which stated:

> " 'Confidential relation' is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. Where one is bound to act for the benefit of another, he can take no advantage to himself. No precise language can define the limits of the relation; it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In such cases, the "confidential relation" is a conclusion of law; in others, as parent and child, it is a question of fact to be established by the evidence." *Id.* at ¶ 15, at 154–55.

25. There exists language in a few of our decisions suggesting that the presumption of undue influence cannot be applied to a person who is the natural object of a testator's bounty even if the basic facts of the presumption could otherwise be established. For example, in *In re Estate of Beal, supra* note 24, at ¶ 14, at 154, we stated,

> "There is an old and unbroken line of authority, however, stating that the burden is met and a presumption of undue influence attaches when the contestant establishes (1) a confidential relationship between the two and (2) that the beneficiary *(who would not otherwise be entitled to the testamentary benefits)* assists in preparation or procurement of the will. (citations omitted) In that event the burden shifts to the party seeking to take under the will to rebut the presumption." (emphasis added)

*See also Anderson v. Davis*, 1952 OK 193, 256 P.2d 1099 and *Hubbell v. Houston*, 1967 OK 138, 441 P.2d 1010. This view was taken in *In re Estate of Foley*, 1974 OK CIV APP 38, 531 P.2d 1075, in which the Court of Civil Appeals opined,

> "The contestants assert that a presumption of undue influence by the beneficiary arose when it appeared from the evidence that she was in a confidential relationship with the testator and that she had participated actively in the preparation of the will, and that the burden was on the proponent to rebut this presumption, citing *Anderson v. Davis*, 208 Okl. 477, 256 P.2d 1099 (1952). It appears to us that this is too narrow a reading of the *Anderson* case. *In addition to the above factors, that case requires that the devisee be someone not within the ordinary circle of expected beneficiaries of the testator's bounty for the presumption to arise."* (emphasis added) *Id.* at ¶ 5, at 1078.

The exclusion of the "expected beneficiaries" from the purview of the presumption is not and never has been the rule in Oklahoma. Moreover, it has no foundation in the equity jurisprudence of England or America. In the early Oklahoma case of *Myers v. Myers*, 1927 OK 394, 266 P. 452, a case involving the alleged exercise of undue influence by one brother upon another, this court stated the rule that,

> "where undue influence is one of the grounds for the setting aside of a will and a person assists in the preparation of same and is present at the time of its execution and is a beneficiary under the will, and other beneficiaries are excluded from the presence of the testator and a confidential and fiduciary relationship exists, the presumption of undue influence arises which calls for a careful scrutiny by the court, and the burden is upon the proponent to show the absence of undue influence." *Id. at* ¶ 35, at 455–456.

The court in that case found that the relationship between the testator and his brother was not of a sufficiently confidential nature to warrant application of the presumption. *See also In re Sperl's Estate*, 94 Minn. 421, 103 N.W. 502, 504–05 (1905) (reviewing the development of the rules under which courts of equity would set aside gifts made to a donee standing in a confidential or fiduciary relationship to the donor and the gradual extension of those rules to wills made under suspicious circumstances; holding that where confidential relations exist between parties, including parent and child, and one of them obtains from the other an inequitable advantage, equity will set aside the transaction.).

must be *active* participation in the substance of the testamentary act and not just participation in formal matters undertaken at the direction of the will maker.[26]

¶ 24 Mrs. Holcomb was 91 years old when she was left paralyzed and bedridden by a stroke. Her vision and hearing were both significantly impaired. She was completely dependent upon Elaine for her physical needs, including food, shelter, clothing, personal hygiene, the administration of pain medication, and medical and/or nursing attention. Elaine shopped for her mother, wrote her checks, prepared records for the preparation of her tax returns, sent gifts on her behalf, and received her telephone calls and visitors. Elaine had the ability to control the entertainment her mother enjoyed as well as her receipt of news and other information. Mrs. Holcomb died in May 1995 at the age of 96. She lived the last five years of her life in a single bedroom of Elaine's house, apparently never well enough to leave that room except to go to the hospital.

¶ 25 Elaine had physical control of her mother's monthly income. She cashed her mother's social security and royalty checks each month, spent the money (approximately $85,000 over five years), and kept no records from which an accounting could be had. Elaine also had check-writing privileges on her mother's checking account and wrote checks over the five years totaling at least $190,000. Some of the checks went to pay for Elaine's personal and household expenses. Elaine repeatedly wrote checks in excess of the account's balance, incurring significant overdraft charges.

¶ 26 Elaine was actively involved in her mother's legal affairs. Elaine repeatedly consulted with Don Gaston, her mother's attorney, without Mrs. Holcomb's participation in the consultation. Mrs. Holcomb never initiated her meetings with Mr. Gaston despite the testimony of Elaine's children that their grandmother was able to and often did converse by telephone. On at least two and possibly three occasions the attorney drafted documents for Mrs. Holcomb's execution at Elaine's direction without first consulting with Mrs. Holcomb. In each such case, Elaine and/or one of her children benefited from the transaction.

¶ 27 Mr. Gaston also came to represent Elaine sometime during the five-year period he represented her mother and did not disclose this to Mrs. Holcomb. The attorney's time records and billing statements relating to Mrs. Holcomb's legal matters treat Elaine and her mother interchangeably as the client, making it difficult to tell who the client actually was and what was being done for whom. The attorney testified to more than one instance where legal services were performed for Elaine but billed to her mother. Although Elaine paid most of her personal expenses out of her mother's checking account, she paid for all the legal services rendered to her mother with one exception out of her own checking account.

¶ 28 Contestants introduced evidence that Elaine had the kind of personality that could easily have come to dominate Mrs. Holcomb given her frail and dependent condition. Even they, who were not physically compromised and under Elaine's care, found her to be aggressive, intimidating, controlling and manipulative, a dominant personality whom it was useless to oppose. Each felt that he (or she) had a close relationship with Mrs. Holcomb prior to her stroke, providing examples of the ways in which they helped her with her household and personal chores or spent time with her in other ways. Once Mrs. Holcomb was ensconced in Elaine's home, contestants found it increasingly difficult to visit with her without interference from Elaine or one of her children and they came to feel unwelcome in Elaine's house. They testified that Elaine often argued with and denigrated Marc in front of Mrs. Holcomb. Marc and Laura Grace visited their mother

The correct rule is that the kindred relationship between the will maker and the other party does not raise a barrier to the application of the presumption, but is simply one of several factors to be considered in determining whether the presumption arises. *See In re Estate of Maheras, supra* note 3, at ¶ 8, at 272.

26. *In re Estate of Maheras, supra* note 3, at ¶ 9, at 273; *In re Estate of Beal, supra* note 24, at ¶ 20, at 156.

practically every weekend for the five years she lived with Elaine, sometimes traveling long distances, yet Mrs. Holcomb commented to a distant relative in early 1995 that she rarely saw Marc and Laura Grace.

¶ 29 All of these circumstances raise the inference that Elaine was active in the procurement or preparation of the will in contest. Mrs. Holcomb's frail physical condition, her complete dependence on Elaine for the necessities of life, and contestants' testimony that Elaine exercised control over every aspect of her mother's life in a way that excluded them from participating in decisions affecting Mrs. Holcomb gave Elaine the opportunity to abuse the position of confidence she held with her mother. Viewed in the context of these conditions, Elaine's handling of her mother's financial affairs gives credence to the contestants' contention that Mrs. Holcomb's actions were not in fact her own. Elaine's expenditure of tens of thousands of dollars in cash without maintaining any records to account for it is unconscionable under the circumstances. No one who does such a thing can reasonably expect others to accept without explanation that it was spent only as directed by an elderly, ill, bedridden woman. Elaine's handling of the checking account also raises suspicion that it was she and not her mother who controlled the outflow from that account. Not only were funds from that account used in ways that benefited Elaine personally, but the account itself was mismanaged to such an extent that the Bank had to issue a warning that the account was being rapidly depleted. Mrs. Holcomb was made aware of the Bank's warning and, about that time, came to believe that she needed to sell her home in Buffalo in order to remain financially afloat. Yet she assigned to Elaine and Heidi an $80,000 inheritance she had received. There was no evidence that Mrs. Holcomb treated her financial well-being so cavalierly before the stroke left her without the ability to physically control her own financial affairs. It is hence a fair inference that Elaine was substituting her own decisions for those of her

mother and doing so for her own financial benefit.

¶ 30 Elaine's involvement in her mother's legal affairs is even stronger circumstantial evidence that she was active in the procurement or preparation of the will in contest. Elaine met many times over the years with Mrs. Holcomb's attorney to discuss her mother's legal affairs without the participation of Mrs. Holcomb. Several times this led to the drafting of instruments—including at least one earlier will—for Mrs. Holcomb's execution on Elaine's instructions without the attorney first consulting with Mrs. Holcomb. The attorney's time records show that Elaine met with him close in time to the events in controversy and that Mrs. Holcomb was not included in the consultation.

¶ 31 Although there is no direct proof of Elaine's active participation in the procurement or preparation of her mother's will, the outlined factors constitute a sufficient convergence of circumstances to justify shifting to the will's proponent the burden of producing evidence of the nonexistence of undue influence.

### B.

### The Will Proponent's Rebuttal of the Presumption

¶ 32 The party against whom a presumption of undue influence operates has the burden of introducing evidence which would support a finding *of the nonexistence of undue influence.* In *In re Estate of Maheras,* we cited two factors as admissible evidence to meet this burden: (1) the termination of the confidential relationship prior to the will's execution and (2) the receipt by the will maker of independent and competent advice regarding the disposition of the estate.[27] Some may have interpreted *Maheras* as restricting the evidence admissible to rebut the presumption to these two factors alone. Recognizing that *Maheras* lends itself to this interpretation, we take today the opportunity to clarify that while proof of the two factors cited in *Maheras* will generally suffice to

---

27. *Hunter v. Battiest,* 1920 OK 277, ¶ 20, 192 P. 575, 576; *In re Estate of Maheras, supra* note 3, at ¶ 9, at 273.

rebut the presumption, their absence is not fatal to the presumption's rebuttal so long as other probative evidence is adduced. This accords with the unfettered evidentiary norm set out in our earlier common law that the presumption of undue influence "is one that may be overcome by evidence such as will lead the court to conclude that no undue influence was exerted." [28]

¶ 33 The will proponent argues that she introduced evidence which would support a finding of the nonexistence of undue influence. The will proponent does not bear the burden of persuasion, but must simply introduce *some evidence* from which the trier *could find* that undue influence did not engender the will's dispositive provisions. While we agree with contestants that record proof of the two *Maheras* factors—termination of the confidential relationship and receipt of independent advice—is lacking, we hold that the will proponent introduced other evidence sufficient to support a finding of the nonexistence of undue influence.

¶ 34 We address the *Maheras* factors first. With respect to the first factor, the record contains no evidence—and the will proponent does not contend—that the confidential relationship between Elaine and her mother was severed prior to the initiation and execution of the will in contest.

¶ 35 The second factor recognized in *Maheras* as sufficient to rebut the presumption is that the will maker received independent advice, i.e. advice separate and apart from the party with whom the will maker stands in a confidential relationship. *Advice* is "an opinion or recommendation offered as a guide to action." [29] For advice to be considered *independent,* the advisor must (1)

provide the will maker with a full and private consultation regarding the disposition of his estate, (2) be competent to inform the will maker about the legal effect of his dispositive intentions, and (3) be sufficiently dissociated from the interest of the party with whom the will maker stands in a confidential relationship that the advisor can provide impartial and confidential advice.[30]

¶ 36 The record before us indicates that although Mrs. Holcomb's attorney met privately with her from time to time, he spent a great deal more time with Elaine consulting about Mrs. Holcomb's legal affairs than he did with Mrs. Holcomb. These consultations included lengthy discussions of family history from Elaine's perspective and resulted on a few occasions in documents being drafted for Mrs. Holcomb's execution without first consulting her. A critical component of independent advice is the advisor's knowledge of the will maker's circumstances *ascertained through consultation with the client.* The inference in this case is practically unavoidable that any advice Mr. Gaston gave Mrs. Holcomb regarding the disposition of her estate was formulated in the context of information received from Elaine rather than from Mrs. Holcomb. Additionally, Mr. Gaston's testimony did not establish that he offered her any advice or counsel about the legal consequences or familial ramifications of leaving her entire estate to Elaine. In light of the attorney's knowledge of Mrs. Holcomb's physical infirmities, her dependence on Elaine, and Elaine's active involvement in her mother's legal affairs in general, the record proof of the attorney's interaction with Mrs. Holcomb can hardly be said to

---

28. *In re Anderson's Estate,* 1929 OK 434, ¶ 0, 142 Okla. 197, 286 P. 17, 17–18 (Syl.4); *In re Harjoche's Estate,* 1944 OK 96, ¶ 14, 146 P.2d 130, 132 (stating, with respect to the rule requiring proof of independent advice, that the "rule seems rather harsh, and restricted as to the character of evidence that may be received. It is not every testator that needs competent and independent advice in such matters."); *In re Estate of Foley, supra* note 25, at ¶ 7, at 1079 ("[W]e do not agree that the rebuttal of undue influence under Oklahoma law requires proof of independent advice given to the testator as to the wisdom of his chosen course of action. This is simply one

method of rebutting the presumption of undue influence, not the exclusive method."); *In re Estate of Sneed, supra* note 2, at ¶ 18, n. 22, at 1118, n. 22. *Accord, In re Bottier's Estate,* 106 N.J. Eq. 226, 150 A. 786, 787 (Prerog.Ct.1930); *Betz v. Lovell,* 197 Ala. 239, 72 So. 500 (1916).

29. Webster's Encyclopedic Unabridged Dictionary of the English Language 21(Gramercy Books 1996).

30. *In re Estate of Maheras, supra* note 3, at ¶ 9, n. 21, at 273, n. 21.

show that independent advice was given.[31]

■ ¶ 37 Despite the absence of proof of the *Maheras* factors, we agree with the will proponent's contention that other evidence in the record was sufficient to support a finding of the nonexistence of undue influence. Elaine was not only a natural object of her mother's bounty, but had by nature a greater claim to her mother's affection and gratitude in light of the daily care she provided to her for five years.[32] Influence arising out of acts of kindness, does not constitute undue influence.[33] There was testimony that Mrs. Holcomb, despite her physical impairments, continued to have at the time of the critical events in controversy a strong will and independent nature, which prevented anyone, including Elaine, from controlling her actions. Inferences to the contrary from Elaine's *physical* control of Mrs. Holcomb's financial and legal affairs were controverted by testimony that all financial and legal transactions initiated or carried out by Elaine were done so only at Mrs. Holcomb's express direction and under her complete control.

¶ 38 Furthermore, the inference from Elaine's active involvement in her mother's legal affairs that she unduly influenced the will at issue is directly contradicted by Mr. Gaston's testimony that Elaine had absolutely nothing to do with fashioning the contents of her mother's will. While admitting that he had performed some legal services for Mrs. Holcomb at Elaine's direction, Mr. Gaston was adamant that no such thing had taken place in the drafting of this will. He testified that it was Mrs. Holcomb alone who provided the dispositive terms of the will to him and that this was done outside of Elaine's presence. He further testified that Mrs. Holcomb cogently told him her reasons for the disposition she was making.[34] He also pointed out that after the will was executed, Elaine made a comment to him that indicated she did not know the nature of the changes her mother had made to her will.

¶ 39 Other evidence rebutting the presumption of undue influence came from Elaine's two daughters, who testified that on several occasions they had heard their grandmother say she wanted to leave everything to their mother and that their mother tried to dissuade their grandmother from doing so.

¶ 40 Finally, the testimony of the neighbor who frequently visited Mrs. Holcomb and served as the proxy signer to her 1995 will also supported a finding of the nonexistence of undue influence. She testified that she visited with Mrs. Holcomb for thirty minutes after the will's execution, at which time Mrs. Holcomb told her that she had left everything to Elaine because she wanted to be sure Elaine was financially secure. This expression of concern for Elaine's financial security was not inconsistent with actions Mrs.

---

31. *See Miller v. Miller*, 138 N.J. Eq. 225, 47 A.2d 32 (1946), in which an *inter vivos* gift of a home was made by a 70 year-old mother to her daughter. The mother suffered from some degree of dementia and the daughter had been caring for her for years. An attorney was asked by the mother's pastor to call on her and the attorney did so and conferred privately with her. The mother told him without any prompting that she wanted to give the house to her daughter because of her daughter's devotion. The court noted, "The attorney did not inquire into the mother's financial condition or advise her as to the wisdom of the proposed transfer. He merely took her instructions." The attorney then drafted the deed and called upon the mother again for its execution. The attorney at that time "explained in a formal way the contents of the document, that is, that it was a deed conveying to her daughter the homestead." Based on this interaction between the attorney and the mother, the court said, "It does not appear that Mrs. Miller received any advice in the transaction. The advice which the law requires is not a mere statement of the operation of the deed but is a calling to the mind of the transferor of the probable or possible effect upon her of the transaction and a counseling with her as to whether or not she should make the gift." *Id.* at 229–30, 47 A.2d 32.

32. In this connection, Laura Grace testified that her mother once told her, "The one that spends the most time with you and the one that you're— that helps you a lot you just naturally do a little bit more for them."

33. *In re Estate of Webb*, 1993 OK 75, ¶ 27, 863 P.2d 1116, 1121; *Canfield v. Canfield*, 1934 OK 43, ¶ 10, 31 P.2d 152, 156.

34. Gaston recorded her sentiments in the will, which says, "I hereby give all of my estate to Lela Elaine Carter in recognition of her loving care over the last several years and the fact she has greater financial need than either Laura Grace McNatt or Murray Marcus Holcomb."

Holcomb had taken in the years prior to her illness to assist Elaine.

¶ 41 We hold that the outlined record proof is sufficiently probative of the absence of undue influence to make the presumption inoperative.

### C.

**The District Court's Finding That Mrs. Holcomb's Will Was Not Tainted by Undue Influence Is Not Clearly Contrary to the Weight of the Evidence.**

¶ 42 The will proponent's successful rebuttal of the presumption restores the case to the procedural posture it would have had if the presumption had never been operative.[35] This means that contestants must prove the existence of undue influence by a preponderance of the evidence without the aide of the presumption.[36] Undue influence may be proved directly or circumstantially, but is "ordinarily capable of proof only circumstantially."[37] In *White v. Palmer*,[38] we set out the general principles to be applied to evidence that undue influence was brought to bear. In that case we said,

> "It is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion was brought to bear upon the mind of the testator. It is sufficient that, if from the surrounding circumstances connected with the making of the will it appears that any undue influence has been exercised, the court should not admit the will to probate. In determining the question of undue influence, the court should take into consideration the association of the parties, the opportunity for undue influence afforded the person who is especially favored by the terms of the will, and the effect of the will upon those persons whom we would naturally expect to be the recipients of his bounty.[39]

¶ 43 Contestants introduced no *direct* proof that Elaine exercised undue influence over the terms of her mother's will. What they did introduce was a considerable body of circumstantial evidence that (a) Elaine was a dominant and manipulative figure in the dynamics of the Holcomb family, that (b) Mrs. Holcomb's frailty and dependence on Elaine made her vulnerable to Elaine's dominance and control, that (c) Elaine in fact exercised that dominance and control as demonstrated by her dubious handling of Mrs. Holcomb's money, her suspicious acquisition for herself and her daughter of $80,000 her mother inherited at a time when her mother was worried about her own financial situation, and by her active involvement in her mother's legal affairs. From this evidence the district court could have concluded that Elaine controlled the terms of her mother's testamentary instrument as well-but it did not.

¶ 44 Instead, the district court found that the will in contest was the product of Mrs. Holcomb's free and voluntary act. The evidence introduced by the will proponent in rebuttal of the presumption stands also as the proof of the nonexistence of undue influence in this post-presumption stage of the proceeding. That evidence included testimony that Mrs. Holcomb, although physically unable to carry out tasks on her own, directed Elaine in everything she did on her behalf so that, far from being dominated and controlled by Elaine, Mrs. Holcomb was the dominant force in the relationship. The will proponent also introduced evidence from several sources that her testamentary intent was to leave her entire estate to Elaine in gratitude for Elaine's caretaking and because she feared more for Elaine's financial security than for that of her other kin. The evidence showed that this concern for Elaine's financial situation did not suddenly arise af-

---

35. *See* the provisions of 12 O.S.2001 § 2303(2), *supra* note 17.

36. *Brown v. Minter*, 1922 OK 222, ¶ 4, 207 P. 976, 977.

37. *In re Estate of Beal, supra* note 24, at ¶ 13, at 154; *In re Sperl's Estate, supra* note 25, at 504 ("[P]roof of undue influence on a testator must

concern things hidden from ordinary knowledge, and provable in large measure by circumstances only.").

38. 1971 OK 149, 498 P.2d 1401.

39. *Id.* at ¶ 26, at 1406.

ter Mrs. Holcomb came to live with Elaine, but had already manifested itself for many years. On this record, we cannot say that the district court's finding that the will was not the product of undue influence is clearly contrary to the weight of the evidence.

## V

### SUMMARY

¶ 45 The district court found that the decedent, Laura Edna Holcomb, possessed testamentary capacity and that her will was not the product of undue influence. On review, those findings cannot be reversed unless clearly contrary to the weight of the evidence. Faced with a record consisting of irreconcilably conflicting evidence, we are not free to alter the district court's ruling that contestants failed to meet their burden of establishing lack of testamentary capacity and undue influence. The *nisi prius* findings are not clearly contrary to the weight of the evidence. The order admitting the will to probate must therefore be affirmed.

¶ 46 **THE COURT OF CIVIL APPEALS' OPINION IS VACATED AND THE DISTRICT COURT'S PROBATE ORDER IS AFFIRMED.**

¶ 47 HARGRAVE, C.J., WATT, V.C.J., and HODGES, LAVENDER, KAUGER and WINCHESTER, JJ., concur.

¶ 48 BOUDREAU, J., dissents.

¶ 49 SUMMERS, J., not participating.