George H. BROWN, Marjory Holmes, Edward A. Brown, Ann Brown, and Temple Brown (Contestants of Will), Plaintiffs in Error,

v.

Verna B. BROWN (Proponent of Will), Defendant in Error.

In the Matter of the ESTATE of Charles L. BROWN, Deceased.

No. 36567.

Supreme Court of Oklahoma.

Sept. 20, 1955.

914

W. E. Green, Raymond G. Feldman, Sam D. Glass, Tulsa, for plaintiffs in error.

Simons, Simons, Mitchell, Headrick & Mitchell, Enid, A. E. Montgomery, Tulsa, for defendant in error.

BLACKBIRD, Justice.

This appeal concerns a will contest. It is between the testator's widow, Verna, whom he married within a year after the death, in 1940, of his first wife, Pearl, opposed by the children of his deceased son, Melville, two other living sons, and a daughter, all by his marriage to the first wife. He was 72 when he married Verna and had no children by her. His will, executed June 25, 1947, almost five years before his death, left to Verna all of his estate, consisting of his ranch home and other rural property near Skiatook, Oklahoma, except bequests of $1.00 each to the above-named heirs by his first marriage.

The latter's contest of the will was upon the grounds of the testator's alleged testamentary incapacity and Verna's alleged undue influence over him. The county court, after a general finding upholding said contestants' position, denied admission of the will to probate, but, upon appeal by the widow and trial de novo in the district court, the latter reversed the county court and held the will valid, after specifically finding that, by a preponderance of the evidence, the testator, at the time of his execution of the will, was fully competent and not acting under undue influence on the part of his wife. From said judgment, contestants, as plaintiffs in error, have perfected the present appeal. Our further reference to them, and to the widow, will be by the designations of "Contestants" and "Proponent."

In their briefs, contestants set forth no specific propositions or assignments of error, but their argument, as a whole, is to the general effect that the judgment of the district court (hereinafter referred to as the "trial court") is not in accord with the law nor the evidence. Their counsel, apparently realizing that the direct evidence preponderates neither toward testamentary incapacity nor undue influence, fabricate their argument principally from circumstances. One bit of evidence they cite which might conceivably be called "direct" evidence, however, is a statement contained in a letter introduced as contestants' Exhibit 40, written by a lawyer who was attempting to impress another law firm with the

idea that the testator had done no intentional wrong in the erroneous accounting he had previously filed as administrator of the estate of his first wife, Pearl. The writer of the letter appeared in person at the trial and gave, on proponent's behalf, somewhat contradictory testimony indicating that the testator was competent during his dealings with him. The letter referred to was introduced after he had left the witness stand, and insofar as the record shows, he was never queried concerning, nor asked to explain, the statement in said letter. It is doubtful if the trial judge considered that the letter impeached the witness' testimony, being, as it was, in accord with an abundance of other testimony.

██ Another bit of direct evidence cited by contestants to support their position is an affirmative answer made by the proponent's sister, Mrs. Ericson, who testified concerning the last few months of the testator's life, after he had suffered a second stroke and had, in 1948, come to her home in Fort Worth, Texas, with proponent to be with Mrs. Ericson and proponent's aged aunt during the latter's last illness. The question directed to Mrs. Ericson on cross examination was: "But it is your testimony that he (the testator) was very agreeable with anything that Mrs. Brown had to suggest or offer, and did not raise a fuss?" This testimony does not purport to concern the testator at any time near the date he executed the will in question. The witness' testimony immediately preceding that question concerned observations she had made about his condition the last few weeks of his life, after, according to her, there had been a *change* in his mental condition. Her cited answer was not intended to have, nor has it, any substantial probative value on the question of the decedent's testamentary capacity or competency before he left Oklahoma and began the extended visit in Fort Worth.

In their effort to support their contentions by circumstances, contestants' counsel point to testimony indicating that after his first stroke during a visit in Kansas in 1941, and especially after his second stroke in 1945, the testator was not the forceful and dominating personality he had been

previously, and they portray proponent as a grasping and designing character who early in her marriage to the testator began trying to get control of his property and contrived to take advantage of certain circumstances to turn him against his children. They rather adroitly attempt to show that under the circumstances, including his paralytic condition, the testator was so thoroughly dependent upon her for his needs that he was in no position to do anything else, and so naturally did subserve his will to hers. Such argument would be convincing, if it was sufficiently supported by bare facts, uncolored, and unclothed with inference as they are portrayed in counsel's brief.

██ The first circumstance represented as "evidence" of the proponent's plan "to make herself the recipient of everything" the testator owned, was his execution, nearly a year after their marriage and less than a month after his first stroke, of a deed conveying to her an 80-acre tract given the name of "Brown Acres." There is no proof in the record that the execution of this deed, contrary to its own recitals, was not the free and voluntary act of the grantor; or that it was not in accord with testator's wishes, that said deed was placed of record in 1945, after his second stroke. Nor does the testimony of Frank Cochran, a friend upon whom the testator personally called to have the deed drawn, support counsel's statement that this was proponent's "first overt act" in her claimed plan "to get his property * * *".

██ In order to lucidly discuss counsel's claim that a "disturbed condition" of the testator's mind, in addition to his physical paralysis, facilitated the claimed design of proponent that testator execute what they repeatedly refer to as "an unnatural" will (and which they argue is evidence, in itself, that the testator was irrational) it is necessary to briefly advert to the difficulties testator had in connection with the administration of his first wife's estate, of which he was appointed executor approximately ten months before his marriage to proponent. He filed no executor's report or account for the years following his appointment; and, in October, 1946, Mrs.

Laura Brown, widow of the testator's son, Melville, on behalf of herself and children, (contestants herein) took certain action in the Pearl Brown estate proceedings which ultimately brought about the testator's resignation and his replacement by the testator's son, George (another of the contestants herein) as the legal representative of the Pearl Brown estate. As a part of the aftermath of these proceedings, which sought, among other things, to invalidate Pearl's will leaving all her property to the testator, a surcharge was entered against the testator and an order issued restraining all further disbursements from his and the proponent's bank accounts. Without delineating all of the details of the various phases of this situation and others that grew out of it, it is sufficient to say that, as a result of the need testator felt to liquidate his property to obtain funds to satisfy this surcharge and have something left for him and his wife to live on during their remaining years, the testator, after consulting with his friend Frank Cochran, offered to sell his property to his children on the condition that he be allowed to retain a life estate in the home. The son, George, was the only one who evidenced any interest in accepting any part of this proposal. He proposed to purchase 210 acres of unimproved land (which had been appraised by Frank Cochran at $40 per acre) for a total price of $4,620.20 (or less than $25 per acre), of which $2,025.20 was to be paid by satisfying the surcharge against the testator in that amount previously entered against him in the above described Pearl Brown estate proceedings. Contestants introduced evidence, including the testimony of George Brown himself, calculated to show that the testator wanted to make the sale to him, but that it was never consummated because of proponent's objection. This is cited by counsel as proof of proponent's influence and control of the testator's acts, which they say, governed his "unnatural" testamentary disposition—an influence she allegedly exercised during this period of his physical weakness and dependency, and under the strain of disturbing circumstances in his affairs—and brought about a situation which aided the proponent in turning him against his children and in imposing her will upon him to the extent of dictating said testamentary disposition. Here again, the facts established by the record do not support counsel's argument. The testimony is somewhat conflicting as to whether proponent's disapproval was the sole reason the testator never "went through" with the above-described sale, but we think the fact, established by other testimony, that the testator refused to sell any of his land to another party at the similar, or higher, price of $25.00 per acre, indicates that the underlying reason he didn't sell to George was his final decision that the cash realized from such a proposed sale would be insufficient, rather than because of personal animosity between the two, or any way that he was imposed upon, or controlled by, any blameworthy desire or conduct on the part of the proponent.

Nor do we find evidence in the record to support the significance counsel's argument attaches to other circumstances such as the fact that a lawyer was called to draw the testator a will after he already had the one involved here (drawn by his friend Frank Cochran); and, to the fact that several months after his execution of said will (devising *all* of his property to proponent) she and the testator executed a joint survivorship deed purporting to convey to themselves as grantees, the 130-acre tract of land which included at least a part of their homestead.

We have carefully examined the entire record and find no circumstances pointed to by contestants as evidence of the decedent's testamentary incapacity, or proponent's allegedly undue influence over him, that is sufficient to support a determination contrary to that of the trial court. There are few, if any, material circumstances shown by the record, to have the relation to the situation ascribed to them in contestants' argument. We find nothing about the testator's will that is "unnatural", or contrary to human nature, in view of the trouble, expense and anxiety caused him by the events that transpired in connection with the Pearl Brown estate proceedings at a time when he was practically an in-

valid and unable to easily defend himself, especially, when considered in contrast to the good care and faithfulness undisputedly given him by the proponent. Nor do we agree that the force of the circumstances argued by contestants', counsel, coupled with the testator's physical condition, rendered his regularly executed will invalid. See In re Martin's Estate, Okl., 261 P.2d 603. The majority of the witnesses who, as far as the record shows, had no interest in the outcome of the contest, and who had the best opportunity of forming competent, impartial, and reliable opinions as to Mr. Brown's testamentary capacity, gave testimony supporting the trial court's findings and conclusions. While, as herein indicated, there is some testimony to the contrary, including that of the contestants themselves, the trial court's judgment cannot be held to be against the weight of the evidence. Accordingly, it must be and is hereby affirmed. See In re Martin's Estate, supra.

JOHNSON, C. J., and CORN, DAVISON, HALLEY and JACKSON, JJ., concur.

WILLIAMS, V. C. J., and WELCH, J., concur in result.