In the Matter of the ESTATE of O. L. LACY, Deceased.

Della Lacy ROBERTS, Plaintiff in Error,

v.

Agnes MIELKE and Laura Lacy, Defendants in Error.

No. 41080.

Supreme Court of Oklahoma.

May 23, 1967.

Rehearing Denied June 27, 1967.

As Corrected and Second Petition for Rehearing Denied Sept. 12, 1967.

Frank Gibbard, Sulphur, Jeff R. Laird, Sulphur, Orel Busby, Ada, for plaintiff in error.

John C. Powell, Sulphur, for defendants in error.

PER CURIAM.

This is an appeal from a judgment of the district court affirming an order of the county court directing that the will of O. L. Lacy, deceased be admitted to probate.

The will herein contested, which was executed by the testator on April 2, 1963, provided for the distribution of his estate to his wife, Laura Lacy, for life, and the remainder to his daughter, Agnes Mielke, if living, and should the daughter be deceased at the time of the death of his wife, then the remainder to her surviving children. The will further provided that Agnes Mielke be appointed as sole executrix, without bond. The will also gave to his seven remaining children and a grandson the sum of $1.00.

The proponents for the probate of the will are the surviving widow, Laura Lacy, and daughter, Agnes Mielke. The contestants on appeal are the remaining seven surviving children of the testator.

The contestants seek to invalidate the will of the testator on the grounds that he lacked testamentary capacity and that the will was produced through fraud and undue influence. We have examined the record

and briefs and find no evidence of the exertion or presence of fraud or undue influence upon the testator in the execution of the alleged will and confined our opinion to the sole issue of whether the testator had sufficient testamentary capacity to execute the will on April 2, 1963.

The rule for testamentary capacity is well established and defined. The difficulty lies not in defining the requirements for testamentary capacity, but in applying the rule to the facts of each case. For as we have said, "[t]here is no rule by which it may be determined, with precision, where capacity ends and incapacity begins". Slater v. Phipps, 193 Okl. 267, 143 P.2d 133. The rule for testamentary capacity was aptly defined in In re Martin's Estate, 199 Okl. 567, 188 P.2d 862, as follows:

"A person has testamentary capacity when his mind and memory are such that he knows, in a general way, the character and extent of his property, understands his relationship to the objects of his bounty and to those who ought to be in his mind on the occasion of making a will, and comprehends the nature and effect of the testamentary act."

It is axiomatic that the question of testamentary capacity is a question of fact and the finding of the trial court will not be disturbed on appeal unless it is clearly against the weight of the evidence. Brummett v. King, 207 Okl. 607, 251 P.2d 1062; In re Williams' Estate, 207 Okl. 209, 249 P.2d 94; Hutchings v. Bailey, Okl., 290 P.2d 405. But a will contest is a case of equitable cognizance and on appeal this court will examine the whole record and weigh the evidence. In re Wadsworth's Estate, Okl., 273 P.2d 997.

In the present case the proponents of the will established due execution and attestation of the will. This evidence creates a presumption of testamentary capacity and the burden of proving unsoundness of mind of the testator is upon the contestant. Brown v. Brown, Okl., 287 P.2d 913. But proof of testamentary ca-

pacity of a testator is not necessarily confined to the exact time of the execution of the will. In the case of In re McCurtain's Estate, Okl., 377 P.2d 210, we stated:

" * * * the court may consider such evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, as would tend to show his mental condition at the time of execution of the will."

With these principles of law in mind, we proceed to a discussion and review of the facts in the present case.

The testator had nine children by a prior marriage. One child predeceased the testator and left surviving him one son. In 1939 the testator's wife was killed in an automobile accident. Approximately four years later the testator remarried, but after a short duration the marriage was terminated by divorce. Apparently one of the participating factors that led to the dissolution of this second marriage was the abusive conduct of the wife toward one of the deceased's children.

On April 3, 1948, in answer to a newspaper advertisement, Laura Lacy, one of the proponents herein, was hired as a housekeeper and lived in the testator's home. On April 26, 1948, Laura and the testator were married. Before the marriage, Laura owned some property and later sold it for $2500.00. This money was used during the marriage for the mutual benefit of the testator and herself.

The testator died on August 29, 1963, at the age of 77 years, and left surviving him, his wife, Laura, and eight children by his first marriage and a grandson, the son of a deceased child. Prior to his death, the testator suffered from a prolonged and extended illness, during which period of time, he executed on April 2, 1963, the contested will herein. From the record it is apparent that the testator was a man of frugal habits, possessed some business ability, and accumulated a considerable estate.

■■ The proponents presented eight witnesses: Laura Lacy, Agnes Mielke, a general contractor, an ambulance driver, an attorney who prepared the will and the three subscribing witnesses to the will. Only four of these witnesses testified as to the mental capacity of the testator. Neither one of the proponents, who were called as witnesses, volunteered or submitted any testimony in regard to the issue of testamentary capacity of the testator. Their silence is of evidentiary significance, for Laura was present on the date the will was signed and was a close companion during all periods of the deceased's final illness, and Agnes Mielke had been staying in the home of testator for approximately ten days, assisting in his care, immediately before the date of the will. It is also significant that one of the three subscribing witnesses and the attorney who prepared the will did not testify as to the mental competency of the testator, although both were called to testify as witnesses on behalf of the proponents. The absence of such testimony on the vital issue of testamentary capacity, without explanation, by these four witnesses cannot be ignored. See Rogers v. Cato Oil & Grease Co., Okl., 396 P.2d 1000. Where witnesses are silent on a vital issue of which it appears they have knowledge, their failure to testify may be considered by the court in determining the mental competency of a testator.

Although the general contractor and the ambulance driver testified that there was nothing in the testator's conduct to indicate any mental abnormality, they had only limited contact and association with the testator. The only contact of the ambulance driver with the testator was when, on occasions, he transported the testator to and from the hospital. The general contractor had constructed a building for the testator one year before his death. The contractor admitted that during this period of construction the testator would come to the construction site daily and "pick up all the pop bottles," which caused some difficulty

with the workmen. He further testified that he visited with the deceased in the hospital in May, 1963, but when asked if he noticed any difference in his mental condition in May, he answered, "well he was sick and I only visited with him about five minutes."

The second subscribing witness testified that in his opinion the testator was mentally competent on April 2, 1963. However, his opinion appears to be based primarily on prior associations with the deceased, as he did not have an occasion or opportunity to converse, observe or visit with the testator during his final illness, except for the brief period when he witnessed the execution of the will.

■ The third subscribing witness was Dr. D., the attending physician of the testator at the time the will was executed. The witness testified that in his opinion the testator was mentally competent on April 2, 1963, but the effect of this opinion is diminished by his following testimony:

"Q. From your knowledge of the patient, do you have an opinion as to whether or not he was competent to make a will?

A. Yes, I do.

Q. And what is that opinion.

A. He was as competent at that time as he was at any time as long as I knew him.

The evidence does not show that Dr. D. was acquainted with the testator prior to November 1962. The opinion of this witness, and the foregoing witnesses, must be weighed against those witnesses who testified as to testator's incompetency. When this is done, the clear weight of the evidence yields to the conclusion that the testator lacked testamentary capacity to execute a will.

The attorney who prepared the will testified that two days prior to the date of the will, he went to the home of the deceased at the request of the testator when he was asked to prepare his will. When the at-

torney advised the deceased that the will might be contested by some of his heirs who were to receive one dollar, the deceased was offended by the intrusion and told the attorney, "it wasn't any of his business how he disposed of his property." The attorney then inquired of the deceased the name of his doctor and advised him that if the doctor "says that you know what you are doing and you are all right, why, then I will come out and bring the will." The deceased furnished the name of the doctor, Dr. D., and the names of two persons he wanted as attesting witnesses to the will. On this occasion, although the conference between the deceased and the attorney was held in private, one of the proponents, Mrs. Lacy, was present in the house.

The attorney returned to the home of the testator on the morning of April 2nd with the will. He testified that he handed the will to the deceased to read, but that the will was not read to him nor were the provisions or contents of the will explained or discussed. He returned in the afternoon when the will was signed by the deceased and attested by the three subscribing witnesses. The evidence shows that the deceased was handed the will to read and sign, but again the provisions and contents of the will were not explained or discussed. The evidence shows that, due to the weakened condition of the testator, he was unable to read and on occasions had requested that others read to him.

The testator was treated by Dr. L. in November, 1962, on six separate occasions. This physician diagnosed his condition as high blood pressure, hardening of the arteries and arthritis in the right shoulder. As to his mental competency, the doctor testified:

"Q. What was your estimate of his mental condition?

A. I don't think he was mentally competent at any time I saw him.

Q. Was his condition such that you could see any hope for improve-ment, insofar as the mental condition is concerned?

A. No, not mentally * * *."

From December, 1962, to March 16, 1963, the deceased was treated as a patient of Dr. M. of Ada, Oklahoma. During this period of time, the condition of the testator grew progressively worse and on March 11, 1963, he was admitted to the Valley View Hospital, Ada, Oklahoma, for treatment. Dr. M. testified that the deceased while in the hospital was suffering from a severe brain disease due to the hardening of the arteries, which produced abnormal hallucinations and delusions. The doctor's testimony, which was supported by the hospital record, further revealed that during this period of hospital confinement the testator was disoriented, confused and irrational. The testator was discharged from the hospital on March 16, 1963, to the care of Dr. D. in Sulphur, Oklahoma. Dr. M. stated that he saw no prospects of improvement in the mental condition of the testator and that in his opinion the testator's "mental condition would have a good chance of being poorer" on April 2, 1963, than it was on March 16, 1963.

A sister of the testator, Nobie Spaulding, testified that his mental condition started deteriorating two or three years before his death. She stated that when she visited the testator on April 8, or 10, 1963, his condition was "noticeably worse," and that "he acted like a ten year old kid." The witness also related a conversation she had with the testator on or about April 10, 1963, when the testator said, "he had $50,000.00 made over to each child and that since he had paid a mortgage off on Della's property she'd get one dollar."

A local plumber, who was a long time acquaintance of the testator, testified that in the last months of the testator's life, he was unable to carry on a normal and rational conversation. The witness said that in the last six months the testator was, "in my opinion, just off."

Another acquaintance of many years, an abstractor, testified that there was a sub-

stantial change in the testator's manner of conducting his business during the latter part of his life. He related one incident and said of the testator, "I didn't think he was—it was kind of a crazy thing, I mean, he just wasn't thinking."

A daughter, Stella Faist, Denver, Colorado, testified that the last time she had visited with the testator was in July, 1962, until she came to Sulphur on April 9, 1963, to care for him, and that she was "shocked" at his appearance and the deterioration of his condition. She stayed with the testator for about one month. She testified that the testator told her that his estate was worth $300,000.00 and that under his will each child was to receive $50,000.00, except Della. In a later conversation, the testator told her that he had "taken care of all the children equally, but Della, but that he was sorry he had left Della out and wanted her to make it right with Della." The testator requested her to call his lawyer and have his will changed. She did not call the lawyer as requested and the matter was never mentioned again. Also, a letter from this witness to her sister, Agnes Mielke, was admitted in evidence, dated April 27, 1963, in which she expressed serious concern about the testator's mental condition, and related in the letter incidents of abnormality.

Richard Lacy, a son, testified that in February, 1963, when he visited his father, that his "frame of mind * * * was terrible * * * it was not only his children, but the people in town and everybody in town was after him." The son testified that the testator told him he had made a will and said, "all of you will be taken care of."

Lila Lacy Newell, a daughter, testified that when she visited the testator on April 12, or 13, 1963, he said, "that each child was going to be left $50,000.00 each and that he was going to let bygones be bygones with Della and leave her $50,000.00."

Oliver Lacy, Jr., a son, testified that in December, 1962, his father telephoned and "said he was sick and wanted me to come home." The witness stated that he came to Sulphur and took his father to clinics in Sulphur and Ada. The witness said that he returned to his home in Indiana, but in the first part of January, 1963, his father again telephoned and said that one of his sisters had accused him of attempting to declare the testator incompetent. He returned to Sulphur on several occasions and described the relationship with his father as "pretty good, but he was sick and he didn't talk much." The witness was also of the opinion that during this period of illness the testator could not read.

Della Lacy Roberts, a daughter, testified that when she saw the deceased in December, 1962, she was "shocked" by his condition. The witness said that when the testator was in the hospital in April, 1963, that "he did not know me and would call me by another name until I straightened him out."

Woodrow Lacy, a son, testified that in January, 1963, he was called to come see his father and "was surprised his condition was so bad." He said that Laura and three of the children provoked an argument on the matter of incompetency in the presence of the deceased, but "he did not seem to care one way or the other."

 The will of the testator was an unnatural will. He left the bulk of his estate to one child, Agnes Mielke, to the exclusion of his seven other children. While not conclusive, an unnatural disposition of property by the testator may be considered in determining his testamentary capacity. See, In re Smith's Estate, 197 Okl. 405, 172 P.2d 328. In 94 C.J.S. Wills § 62, it is there stated:

"The fact that the will is unjust or unnatural does not of itself establish testamentary incapacity, but it is a circumstance which may be considered in connection with other evidence, and which may have weight in determining the capacity of the testator; and an unnatural or unjust disposition coupled with other

evidence indicating incapacity may justify a verdict against the will."

It is natural for a person to make provisions in his will for those who were particularly close and helpful to him during his lifetime, and more especially, to those within his own family. In some instances, where one member of the family has completely devoted his efforts and energies to the care and attention of a testator, it is only natural that this one be preferred in the will. But in the instant case the record does not show any particular reason, purpose or motivation for the testator to devise the bulk of his estate to his daughter, Agnes Mielke, and to disinherit his other children. While the evidence shows that Agnes Mielke was a devoted daughter and attended to her father's needs and comfort during his final illness, she did no more than the other children. Agnes, as most of the other children, lived a considerable distance from Sulphur and her visits and contacts with the testator were limited and infrequent. The evidence also shows that if the testator had a "favorite child" Agnes Mielke was not the one.

In 1956 one of the testator's daughters sent a lawyer from Kansas to Sulphur to investigate the estate of her mother. Apparently, this investigation was misinterpreted by the testator as an attempt by some of the children to have him declared incompetent. The testator had at different times accused three of the children. However, the subsequent conduct and expressions of the testator toward his children would indicate that he was satisfied that his accusations were unfounded.

The record reveals a contradiction between the family history of the testator and the provisions of his will. Throughout his life the testator was a devoted father to his children and evidenced concern for their well being. The evidence also shows that during his final illness he wanted his children to visit him and made several requests for their services and attention.

Although the testator executed the will on April 2, 1963, the evidence shows that he was not aware that he had made such a will, but on the contrary, had expressed to others, before and after April 2, 1963, that each of his children had been provided for equally in his will.

That the testator did not know the extent and nature of his properties is evidenced by his statements that he was leaving each child $50,000.00. This was not a mere exaggeration. The statements would necessarily indicate that he believed his estate was worth in excess of $400,000.00. Even the proponents argue that such an estimate is "fantastic." Although no inventory and appraisement of the estate has been filed, one of the witnesses for the proponents estimated the value of the testator's estate at $200,000.00.

We have carefully reviewed the record and conclude that the finding by the trial court that the testator possessed sufficient testamentary capacity is clearly against the weight of the evidence. The judgment of the trial court is reversed with directions to deny the will to probate.

This Court acknowledges the services of P. D. Erwin who with the aid and counsel of Richard James and John W. Taber, as Special Masters, prepared a preliminary advisory opinion. These attorneys have been recommended by the Oklahoma Bar Association and appointed by the Court. The Chief Justice then assigned the case to HODGES, J., for review and study, after which and upon consideration by the Court, the foregoing opinion was adopted.

All Justices concur.