OSCN Found Document:RIVENBURG v. CILIBERTI

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 RIVENBURG v. CILIBERTI
2023 OK 109
Case Number: 120042
Decided: 11/14/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2023 OK 109, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

In the Matter of the Estate of VELDA MAE RIVENBURG, Deceased

EARL AUSTIN RIVENBURG, Appellant,
v.
BRIDGET CILIBERTI, Personal Representative of the Estate of Velda Mae Rivenburg, Appellee.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION I

¶0 The District Court of Garfield County, the Honorable Tom L. Newby, Associate Judge, ordered the admission to probate of a will executed in 2018 by Velda Mae Rivenburg, after denying challenges to the will brought by the testator's son. Son appealed. The Court of Civil Appeals, Division I, affirmed. Son sought certiorari review.

CERTIORARI PREVIOUSLY GRANTED;
COURT OF CIVIL APPEALS' OPINION VACATED;
ORDER OF THE TRIAL COURT REVERSED;
REMANDED FOR FURTHER PROCEEDINGS

Julia C. Rieman, Gungoll, Jackson, Box & Devoll, P.C., Enid, OK for Appellant.

David C. Henneke, Enid, OK for Appellee.

KUEHN, J.

¶1 Velda Mae Rivenburg (Rivenburg) passed away in February 2020 at the age of eighty-seven. She lived alone in the Garfield County home in which she was born. Besides her homestead, she owned several parcels of land as well as mineral interests and other assets. She is survived by one son, Appellant Earl Austin Rivenburg (Austin), and one daughter, Appellee Bridget Ciliberti (Bridget). This suit involves a contest to Rivenburg's last will.

¶2 In April 2018, Rivenburg fell ill. Bridget traveled from her home in Tennessee to help her mother. Austin, who was stationed overseas as a civilian employee with United States Government, obtained leave from his post to travel to Oklahoma. Austin spent a month attending to his mother in the hospital, and making and paying for renovations to her home so that it would be more handicap-accessible. The parties agree on one thing: Rivenburg feared spending her final days in a nursing facility. She hoped to depart this life from the home that her forbears had built. Austin testified that his goal was to take whatever actions were necessary to allow her to continue to live at home.[1]

¶3 That summer, after Austin returned to his overseas job, he was contacted by a long-time friend of Rivenburg's, Karen Heizer. Heizer was concerned that Bridget might be manipulating their mother into selling or mortgaging real estate to help Bridget pay off debt. According to Heizer, Rivenburg said that Austin was aware of the situation and had no problem with it -- which, according to Austin's testimony, was untrue. Austin called his mother in June 2018 and broached the subject with her. Rivenburg became angry with him and hung up. Bridget's son later warned Austin that further contact with Rivenburg might cause problems, and even advised Austin not to travel home to visit his mother anymore.[2]

¶4 Within weeks of returning to his job overseas, Austin received notice that Bridget had initiated guardianship proceedings for their mother. The topic had never been discussed while Austin was in Oklahoma. Writing to the court, Austin objected to Bridget being appointed guardian, listed examples of what he believed to be a history of Bridget's financial manipulation of their mother, and disclaimed any interest in acting as guardian himself. The guardianship was abandoned as soon as Rivenburg decided to change her will in September 2018. This will differed considerably from one Rivenburg had made in 2014, substantially reducing the property bequeathed to Austin in favor of Bridget.[3] The reasons Rivenburg gave for this change are discussed in detail below.

¶5 After Rivenburg's death in early 2020, Bridget sought to probate the 2018 will and have herself named personal representative. Austin challenged the will, claiming it was the product of fraud and undue influence on Bridget's part. In a hearing that lasted several days, Austin presented evidence to support his challenges. The trial court granted demurrers to both of Austin's claims and admitted Rivenburg's 2018 will to probate. Austin appealed. We assigned the case to the Court of Civil Appeals (COCA), which affirmed the trial court in an unpublished opinion. Austin sought review by this Court. We granted certiorari to review the COCA's decision and to clarify the law applicable to will contests based on claims of fraud in the inducement of a will.

STANDARD OF REVIEW

¶6 A will, or any part of a will, may be declared void if it was the product of "duress, menace, fraud or undue influence." 84 O.S. § 43. A will contest is a matter of equitable cognizance. In re Lacy's Estate, 1967 OK 123, ¶ 6, 431 P.2d 366. Once the proponent of the will establishes that it was duly executed in the manner prescribed by law, the burden shifts to the contestant to prove the will's invalidity. Tiger v. Peck, 1917 OK 376, ¶ 4, 176 P. 529; see also 58 O.S. § 41 (in a trial over a will contest, the contestant is plaintiff). Here, the parties agreed that Rivenburg's will was facially valid and that she had the capacity to make it. At the close of Austin's evidence, Bridget demurred to his undue-influence claim. The trial court granted demurrers on both of Austin's claims, thereby absolving Bridget from having to present any evidence to rebut either challenge.

¶7 The scope of our review is determined by the procedural posture at which the trial court's ruling was made. A "demurrer" is commonly understood as a challenge to the sufficiency of the evidence that has been presented by the party with the burden of proof.[4] This is typically a low hurdle, and should only be granted if there is "an entire absence of proof" to support the non-moving party. Fletcher v. Meadow Gold Co., 1970 OK 135, ¶ 14, 472 P.2d 885). However, a different standard applies when the trial court sits as ultimate factfinder, as in matters of equity. See Looney v. Bruin Oil Corp., 1942 OK 67, ¶ 1, 122 P.2d 1007.

When the trial is before a jury, the court cannot weigh the testimony upon a motion for a nonsuit, for the reason that it cannot weigh it at any time; but when the trial is without a jury, the court must eventually weigh the testimony for the purpose of determining where the preponderance is, and there is no reason why it should not so weigh it at the earliest possible time when the rights of the plaintiff will not be cut off by its so doing, and when the plaintiff has introduced all of his proof and rested, no right of his will be cut off if the court then determines what has been proven.

Lowrance v. Henry, 1919 OK 170, ¶ 21, 182 P. 489 (emphasis added; citation omitted). Hence, the following rule applies in matters of equity:

Instead of disregarding all evidence supporting the demurrant's position, and considering only the evidence favorable to plaintiff, together with all reasonable inferences to be drawn therefrom, and overruling the demurrer, if from such consideration, there is any evidence reasonably tending to support plaintiff's cause of action, the trial court, in an equity case, considers and weighs all of the evidence and determines in whose favor it preponderates.

Henderson v. Gifford, 1957 OK 288, ¶ 10, 318 P.2d 404.

¶8 To summarize, on appeal from the grant of a demurrer in a case of equitable cognizance, the trial court's ruling will not be disturbed unless it is against the clear weight of the evidence. Id. That said, one challenging a will need only establish his case by a preponderance of evidence. In re Estate of Holcomb, 2002 OK 90, ¶ 42, 63 P.3d 9; Brown v. Minter, 1922 OK 222, ¶ 4, 207 P. 976.

ANALYSIS

¶9 Austin only seeks review of the COCA's disposition of his fraud claim, not its handling of his undue-influence claim. He claims the COCA's analysis on fraud was flawed, and that the dearth of case law on the elements of fraud related to the making of a will warrants review and clarification by this Court. We agree that clarification of the law is warranted, and that the lack of guidance may have affected the COCA's (and the trial court's) analysis of what Austin was required to prove to survive a demurrer. Okla. Sup. Ct. Rule 1.178(a), 12 O.S., ch. 15, app. 1.

¶10 Our cases offer no discussion of the elements of fraud to procure a will.[5] As to fraud generally, we have observed:

Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

Stapleton v. Holt, 1952 OK 408, ¶ 13, 250 P.2d 451 (citation omitted). Fraud usually involves some variation of the following elements: (1) a material, false representation; (2) made with knowledge of its falsity or reckless disregard for its truth; (3) made with the intent that it be acted upon by another; and (4) which is in fact relied upon by the other, causing injury. See Dawson v. Tindell, 1987 OK 10, ¶ 5, 733 P.2d 407; Dieterle v. Harris, 1917 OK 580, ¶ 5, 169 P. 873.

¶11 The standard treatise on Oklahoma probate law (citing cases from other jurisdictions) describes fraud in the procurement of a will as follows:

On the whole, the requirements are not different from the necessary ingredients of actions for deceit. The representations must be made to the testator, either by the person benefiting under the will, or at least by someone in his or her behalf. The statements must be false, although under some circumstances suppression of the facts may be sufficient. Furthermore, the representation must be known to be false by the person making it. Innocent misrepresentation therefore does not invalidate the will. As in the case of deceit, the false statements must be made with the intention of procuring the will in question. Hence, a representation made after the execution of the will does not affect the validity of the instrument. Fraud that does not result in the making of the will is immaterial upon the question of whether the will should be admitted to probate.

1 Okla. Prob. Law & Prac. § 6.7 (3rd ed.) (footnotes omitted). Another treatise describes the elements this way:

[Fraud in the making of a will] consists either of a material misrepresentation of fact known by the declarer to be false, or made with reckless disregard for the truth of the statement made, or a false concealment of fact, or an unprivileged nondisclosure by a person, with a duty to disclose, who intends to cause decedent, acting upon fraudulently induced mistake, to do or not to do a testamentary act which otherwise would not have been done.

Eunice L. Ross & Thomas J. Reed, Will Contests (2nd ed.) § 8:10. We hereby adopt the following elements in the context of will contests, which are (as the Oklahoma treatise notes) essentially the same as those for other types of fraud: (1) a representation to the testator, made by one benefiting under the will or on their behalf; (2) which is false; (3) which is known to be false by the person making it; (4) which is made with the intention of procuring or affecting the will in question; and (5) which is shown to have had such effect.

¶12 After acknowledging some of the evidence which supported Austin's claim of fraud, the COCA found Rivenburg's execution of the will before a judge, without her daughter present, to be "compelling" evidence that Bridget did not participate in the drafting of the will. It also noted that Bridget claimed not to know the terms of the will before her mother executed it. These facts alone convinced the COCA that Austin had not met his burden of proof on the issue of fraud. We believe this to be error.

¶13 Fraud and undue influence are separate and distinct concepts. Rood v. Newberg, 718 N.E.2d 886, 892 (Mass.App. 1999); 1 Okla. Prob. Law & Prac. § 6.5. Fraud may play a part in an attempt to unduly influence a testator, but it does not have to. Undue influence alleges that the testator's mind was subtly coerced; fraud alleges that it was deceived.[6] False information can come from anyone, anytime, and linger within the testator's mind until she is convinced that she must act, by making or changing her will.[7]

¶14 When a will is challenged on the basis of undue influence on the testator, the challenger can shift the burden of producing evidence to the will proponent by establishing that the influencer (1) enjoyed a "confidential relationship" with the testator, and (2) "actively assisted in the preparation or procurement of the will." Holcomb, 2002 OK 90, ¶ 18, 63 P.3d 9. Facts commonly weighing against a presumption of undue influence include that the alleged influencer was absent when the will was executed; that she played no part in securing a lawyer for the testator; and that she was unaware of the terms of the will. See generally Ross & Reed, Will Contests (2nd ed.) § 7:5; see also Holcomb, 2002 OK 90 at ¶ 38. However, if the presumption of undue influence is successfully rebutted, the analysis does not end there:

The will proponent's successful rebuttal of the presumption restores the case to the procedural posture it would have had if the presumption had never been operative. This means that contestants must prove the existence of undue influence by a preponderance of the evidence without the aide [sic] of the presumption.

Holcomb, id. at ¶ 42 (footnotes omitted; emphasis added). In other words, while certain facts (such as one's absence when the testator executed her will) are of value to rebut a presumption of undue influence, they have no other special significance. Even after the presumption of undue influence has been rebutted, whether the will contestant has made a prima facie case for his challenge is still an open question, to be decided by considering all of the evidence.[8]

¶15 Furthermore, the rebuttable presumption so often discussed in undue-influence cases has no application to allegations of fraud. See e.g. Silk v. Phillips Petroleum Co., 1988 OK 93, ¶ 13, 760 P.2d 174 (fraud is never presumed from the circumstances, but must arise from a preponderance of all of the evidence). To be sure, whether Bridget participated in the will-drafting process is relevant to whether she intended to deceive her mother, and whether there was a causal connection between any false statement and the making of the will. But it is simply one factor to be considered, along with everything else, to determine whether the evidence of fraud preponderates to the will challenger.[9]

¶16 We believe the evidence presented thus far preponderated in Austin's favor on the claim of fraud. Our starting point -- and a fact never addressed by Bridget in her brief on appeal -- was what Rivenburg told the court about why she was changing her will. When presented with Rivenburg's new will, the judge asked if she had any questions about the proceedings. She replied:

No. I only want you to understand that part of the reason that this was changed was the comments and things my son had done. [Austin] is not completely out of this will, but he will not get any of the land because he has told too many people that he wanted me to [be] declared incompetent, take over, and sell everything...

Unless there is a challenge to a testator's mental capacity (and there is none here), her own explanation for why her will was made is obviously entitled to considerable weight. Cf. Holcomb, 2002 OK 90, ¶ 38 & n.34, 63 P.3d 9 (claim of undue influence was successfully countered by testator's own explanation to lawyer of why she was changing her will).

¶17 Rivenburg's statement to the court establishes a causal link between Austin's supposed plan and her testamentary act, which was less favorable to Austin and more favorable to Bridget than her previous wills. The remaining questions are whether the evidence preponderated in support of Austin's claims that his mother's fears were (1) based on false information, (2) communicated by Bridget with knowledge that the information was false, and (3) communicated for the purpose of gaining advantage in the distribution of their mother's assets upon her death.

¶18 The reason Rivenburg gave for changing her will was quite specific.[10] It is the same reason that she and Bridget gave to the lawyer when they first met to discuss the guardianship process. Bridget emphasizes that her mother's decision to change her will was one she made independently, without Bridget's knowledge. But we find the relationships between Rivenburg, the lawyer, and Bridget -- indeed, the entire guardianship process that ultimately produced the will -- to be decidedly murky.

¶19 Shortly after Bridget arrived from Tennessee, she and her mother visited a local lawyer. The objective, according to testimony from the lawyer, was to discuss "different legal strategies" to prevent Austin from becoming Rivenburg's guardian, gaining control of her assets, and "be able to sell any farmland, or put [Rivenburg] in a nursing home."[11] To that end, they decided to give Bridget control of Rivenburg's assets. Rivenburg's general competency was never in question; according to the lawyer, the guardianship was intended to "allow[] Bridget to help [her mother] with finances."

¶20 Strangely, however, the guardianship process was abandoned as soon as Rivenburg executed her new will -- even though they are ostensibly aimed at different goals (protection of assets while living versus distribution of assets after death).[12] According to the lawyer, in the final analysis the guardianship "really didn't matter because the strategy was to make sure we would have proof that Velda was competent to revise her will." [13] Given this evidence, we are not persuaded that Bridget stood at arm's length from the testamentary act.

¶21 "Rumor" appears to be the appropriate word for Rivenburg's fears. She never claimed -- to her friends, to her lawyer, or to the court -- that her son made these threats directly to her. As for the source of the rumor, several witnesses testified either that (1) Bridget told them personally that this was Austin's plan; (2) Rivenburg told them personally that, according to Bridget, this was Austin's plan, or (3) they heard Bridget relate Austin's supposed plan to Rivenburg.[14] One witness was a bank officer, who met with Bridget and her mother shortly after Austin had returned to his job overseas. The officer recalled that Bridget introduced herself as Rivenburg's guardian. The purpose of the meeting was to have Bridget named as joint owner or beneficiary on "just about all" of her mother's bank accounts. This witness specifically recalled Bridget talking to her mother about Austin's supposed plan to "put her in a nursing home" as the reason for making these changes.[15]

¶22 Austin, of course, adamantly denied ever expressing a desire to take control of his mother's assets and place her in a nursing home. His statement to the court, after receiving notice of the guardianship action, was consistent with this position.[16] Bridget was called as a witness at the hearing. She denied ever telling her mother that Austin had such a plan.[17] Thus, Bridget's testimony was inconsistent with that of several presumably disinterested witnesses who traced the rumor to her.[18]

¶23 On a claim of undue influence in the making of a will, one relevant fact is whether the testator received independent advice from third parties. Matter of Estate of Maheras, 1995 OK 40, ¶ 8, 897 P.2d 268. Attempts to control information that the testator receives are relevant to a claim of fraud as well. See Matter of Estate of Lint, 957 P.2d 755, 763 (Wash. 1998) (evidence supported finding of fraud in the procurement of a will, where perpetrator isolated the testator from family and friends, and falsely told her that her family wanted to put her in a nursing home and seize her estate). Austin presented evidence suggesting that Bridget isolated their mother from friends and associates. This lent some credence to the idea that Bridget was the source of Rivenburg's fears, since the best way to keep a false idea alive is to ward off those who might expose it.[19]

¶24 A will contestant is entitled to the normal inferences which may be derived from the facts. White v. Palmer, 1971 OK 149, ¶ 26, 498 P.2d 1401 (regarding undue influence). An allegation of fraud almost always relies on circumstantial evidence. Griffith v. Scott, 1927 OK 361, ¶ 18, 261 P. 371. Each case depends on its own facts, and all relevant circumstances should be considered together in determining whether fraud has been proven. Id. Prior similar dealings by the alleged wrongdoer may be relevant. Silk, 1988 OK 93 at ¶ 14, 760 P.2d 174. Prior dealings may shed light on motive and witness credibility. Austin presented evidence that, aside from receiving considerable financial help from their mother over the years, Bridget had a history of questionable transactions involving their parents' assets.[20]

¶25 We are always reluctant to second-guess trial courts on questions of fact. Rogers v. Pennington Grocery Co., 1925 OK 489, ¶ 4, 239 P. 126. Nevertheless, having clarified the legal analysis of fraud in the inducement of a will, our careful review of the record compels us to conclude that the totality of evidence thus far presented by the will challenger preponderated in his favor, and shifted the burden of production to the will proponent.

CONCLUSION

¶26 Fraud and undue influence are independent grounds for challenging a will. They may overlap, but the concepts are distinct. The presumption of undue influence in certain situations has no application in cases of fraud. By the same token, facts that rebut such a presumption carry no special weight in analyzing claims of fraud. The Court of Civil Appeals erred by conflating the concepts of fraud and undue influence, and by treating certain facts as essentially dispositive as to both. The trial court should consider all relevant facts to decide if a testator's will was motivated by statements known to be false by the person making them. Here, ruling on a demurrer in a case of equitable cognizance, the question for the trial court was whether the evidence presented thus far preponderated in Austin's favor. We believe the evidence cleared that hurdle. While the ultimate burden of persuasion remains with Austin as challenger to the will, the burden of producing evidence to rebut an inference of fraud shifted to Bridget. Accordingly, the trial court's order admitting Rivenburg's will to probate is reversed, and the case is remanded to give Bridget an opportunity to present evidence on the issue of fraud.[21]

COURT OF CIVIL APPEALS' OPINION VACATED;
ORDER OF THE TRIAL COURT REVERSED;
REMANDED FOR FURTHER PROCEEDINGS

CONCUR: Kane, C.J.(by separate writing), Rowe, V.C.J., and Winchester, Edmondson, Combs, Gurich, Darby and Kuehn, JJ.

NOT VOTING: Kauger, J.

FOOTNOTES

[1] Austin said his mother was very upset that her two sisters had to spend their last days in nursing homes: "She would prefer to die on her farm. And it has always been my intent to honor my mother's wishes and do everything I can to ensure that that's possible."

[2] Rivenburg had mortgaged a parcel of land in 2016 to provide money to Bridget. When Bridget was unable to make payments on the loan, Rivenburg sold the parcel to the Heizers, paid off the loan herself, and provided most of the remaining proceeds to Bridget. Despite this, Bridget characterized Karen Heizer as her mother's "worst enemy." Bridget characterized the receipt of profits from the sale of this parcel as an "early inheritance" for one of her sons.

[3] Among other things, the new will gave Bridget a life estate in all of Rivenburg's real property and testamentary power over the remainder.

[4] The proponent of the will may "demur" to the challenger's evidence for any of the reasons allowed in civil actions. 58 O.S. § 41. In civil actions, a demurrer is a challenge, in a jury trial, to the evidence that has been presented by the party who carries the burden of proof. 12 O.S. § 577. The meaning of the term demurrer has long been rather vague. As a challenge based solely on the pleadings, it has been abolished. 12 O.S. § 2007(C). And the notion of a demurrer to the evidence, in cases tried to the court, without a jury, has been problematic. We described it as an "anomalous practice" in Lyon v. Lyon, 1913 OK 509, ¶ 1, 134 P. 650: "[W]e know of no practice permitting a party, as a matter of right, to inquire into and test the probative effect of his adversary's evidence upon the mind of the judge before final submission of the case... ." Id. See also Davis v. Wallace, 1934 OK 523, ¶ 21, 37 P.2d 602 ("Properly speaking, there is no such practice as that of demurring to the testimony in an equity case") (citation omitted); Bailey v. Privett, 1917 OK 284, ¶ 2, 166 P. 150 (citation omitted) ("The practice of demurring to the evidence in cases tried to the court without a jury appears to be an anomalous procedure followed only by the courts of Kansas").

[5] In In re Sixkiller, 1934 OK 249, ¶ 20, 32 P.2d 936, we summarily found "no evidence whatever" to support the trial court's finding that a will was obtained by fraud. In Howard v. Fields, 1945 OK 62, ¶ 8, 156 P.2d 139, we affirmed a trial court's finding that no fraud in the inducement of a will was established, but did not discuss the elements of the claim in detail.

[6] See in re Dand's Estate, 41 Wash.2d 158, 247 P.2d 1016, 1020 (1952); see also 1 Okla. Prob. Law & Prac. § 6.5 ("When fraud is claimed, the will is questioned, not because testator has been subjected to pressure, but for the reason that he or she is deceived and acts upon false data").

[7] Cross-examination of Austin's witnesses, and Bridget's argument on appeal, focused on their mother's reputation as an independent and strong-willed woman. Such attributes may counter a claim of undue influence, but even the most strong-willed person can fall victim to deceit.

[8] When a rebuttable presumption is available, it is nothing more than an evidentiary shortcut to shifting the burden of producing evidence. It possesses no probative weight of its own, and rebutting the presumption has no effect on the basic facts needed to prove the underlying claim. Stumpf v. Montgomery, 1924 OK 360, ¶ 11, 226 P. 65 ("When evidence is introduced rebutting the presumption, the presumption disappears, leaving in evidence the basic facts which are to be weighed"); Conaghan v. Riverfield Country Day School, 2007 OK 60, ¶ 13, 163 P.3d 557 (a rebuttable presumption "does not change the value or weight of the evidence"); McCormick, Evidence § 344 ("[A]lthough a presumption is available to permit the party relying upon it to survive a motion for directed verdict at the close of its own case, it has no other value in the trial").

[9] The COCA cited Holcomb when concluding that "the burden did not shift" to Bridget to produce evidence on either of Austin's claims. But Holcomb only involved an undue-influence claim, not a fraud claim. The COCA appears to have focused exclusively on facts that rebutted the presumption of undue influence in deciding whether the trial court's ruling about both claims was sound.

[10] In her brief on appeal, Bridget posits some reasons why Rivenburg might have desired to reduce her bequest to Austin. She points to disagreements Austin and his mother had over the years, including one, several years ago, where Austin allegedly shoved his mother during an argument. Austin denied this event ever occurred, and neither Rivenburg's physician, nor any of her friends, ever heard anything about it. She also notes that Rivenburg hung up on Austin in their last phone conversation. She notes that Austin had no plans to reside in Oklahoma and planned to sell any land he might inherit. Austin's relationship with his mother may sometimes have been strained, but it appears that the troubles were often a family affair that included Bridget. And Rivenburg's relationship with Bridget was hardly ideal. Austin presented evidence that their mother had supported Bridget for years and resented it. Also, witnesses testified that Rivenburg was proud of her son's achievements and his career in service to his country. As for the notion that Austin would probably sell any real property bequeathed to him, Rivenburg appears to have been aware of that fact for some time; her previous will only bequeathed to Austin real property that had no sentimental value to her. And the notion that Rivenburg was firmly against selling any of her property is belied by the fact that in 2017 she sold a parcel to aid Bridget. In any event, none of these possible motives was actually mentioned by Rivenburg in her statement to the court about why she was changing her will.

[11] The lawyer's recollection is confirmed by a colloquy at the initial guardianship hearing. Rivenburg said she was afraid her son would seize control of her assets and send her to a nursing home: "That's the reason I started it because I came and talked to you and that was the best way to go with this." The lawyer who first met with Rivenburg and Bridget to discuss guardianship, and who later drafted the will, is sometimes characterized in these proceedings as Rivenburg's lawyer, and sometimes as Bridget's lawyer. A different lawyer was appointed to represent Rivenburg in the guardianship proceeding, and that lawyer was unaware that Rivenburg had even changed her will.

[12] Bridget was unable to post the guardian's bond put in place by the trial court. The lawyer never sought to have the bond reduced or waived because "we had the will signed, and so things were fine."

[13] It is not clear why the guardianship was necessary for Bridget to help her mother with finances. As noted, Bridget had already gained a measure of control over her mother's bank accounts. One could infer that the guardianship process was simply a vehicle to produce a new will -- one with the imprimatur of the court, and therefore less subject to challenge.

[14] As noted, the lawyer hired for the guardianship described this threat as the impetus for the initial meeting, and that meeting included Bridget. According to one friend who visited Rivenburg after release from the hospital, Rivenburg said, "Bridget told me [Austin] wanted to sell the land and put me in a home," and that that was the purpose of putting Bridget in control of Rivenburg's assets. The same friend testified that Rivenburg once "expressed duress" at having to assist Bridget financially, but said that "because Austin was going to sell the property and put her in a home, Bridget feels like she needs to, you know, be in control of my banking and business." This witness heard the same sentiment from Bridget herself. Another friend of Rivenburg's also heard Bridget say that Austin was trying to put their mother in a nursing home. This witness said Rivenburg expressed frustration at having to support Bridget, and once floated the idea of selling some of her property to Williams and her husband to provide funds to Bridget.

[15] Bridget also commented at the time that she did not want Austin to find out about the changes, and accused the bank of having divulged information to Austin that it shouldn't have. When the bank officer assured her that probably was not the case, Bridget "mentioned that Austin must have gotten bank statements from [his mother's] house when no one else was there."

[16] Not only did Austin disclaim any interest in serving as guardian, he also expressly supported his mother's desire not to sell her farmland -- which contradicts the theory that he planned to liquidate her estate before her death.

[17] Bridget contradicted the lawyer's testimony about the purpose of setting up a guardianship. When asked if the purpose was to protect Rivenburg's assets from Austin, Bridget replied, "I wouldn't know what [Rivenburg] exactly thought" -- even though, according the lawyer, Bridget was party to the initial consultations. Bridget denied telling her mother that Austin planned to send her to a nursing home and seize control of her assets. She said she heard her mother repeat the rumor, but that her mother refused to reveal its source. Bridget did not relate any specific incident where she heard her brother make such a threat. In her deposition, Bridget said she had, in fact, told her mother "there have been times" when Austin expressed such an intention. But the only example she provided at the hearing was somewhat dubious. Bridget testified that many years ago, when she and Austin were discussing their mother's situation in general, she walked in and may have heard Austin say something to the effect of, "Is she competent to have the farm?" Bridget could not provide a date for this statement (which seems better characterized as a question, not a threat), but estimated it occurred around 2010. This was some eight years before Rivenburg made the will at issue here, and several years before Rivenburg's previous will, which was more favorable to Austin. Furthermore, Rivenburg did not tell the court that she was changing her will due to anything that Austin said in her presence; rather, she said that she had been "fed" this information by others.

In another twist, Bridget was asked how Austin's supposed plan to send their mother to a nursing facility, and sell off her property, squared with his decision to take leave from his overseas job and spend a month in Enid remodeling her home. Bridget offered a new theory: that Austin worked on their mother's house to avoid sending her to a nursing home, since to pay for that expense, they would have to sell parcels of land that he hoped to inherit.

[18] In discovery, Bridget asserted that Austin had expressed his plan in front of her and her son; at the hearing, Bridget's son could not recall any such event.

[19] Karen Heizer, made many failed attempts to speak with Rivenburg between the summer of 2018 and Rivenburg's death. Heizer said that when she tried to visit Riverburg's home, Bridget refused to let her in, claiming Rivenburg "wasn't of right mind" and "couldn't handle visitors." While Austin was in town in early 2018, he and Bridget asked Rivenburg's long-time tenant farmer to continue overseeing operations for at least another year. However, once Austin left town, Bridget fired the tenant and refused to let him speak with Rivenburg personally. The tenant testified that when Bridget terminated his services, he was owed several thousand dollars for past work. When he tried to visit Rivenburg to at least settle the debt, Bridget ordered her mother to stay in the house. In a similar vein, there was evidence that Bridget attempted to distort the narrative about Austin's relationship with their mother when Bridget spoke to those outside the family. For example, Karen Heizer testified that after Rivenburg's funeral, Bridget commented that her mother "hated" Austin. Yet a hospice worker, who attended to Rivenburg in her last months, said Rivenburg talked about Austin a lot and was proud of him.

[20] In December 2018, a few months after the will was changed, Bridget contacted Rivenburg's life insurance agent about changing the beneficiary designation on her mother's life insurance policy. The change that was made named Bridget as sole beneficiary, and Bridget's son as contingent beneficiary. Austin testified that his mother's signature on the form appeared to be in his sister's handwriting. In 2012, Bridget signed Austin's name to obtain a guardian's bond in reference to their father. Austin claimed she did not have his permission to do this; Bridget claimed that she did. As administrator of their father's estate, Bridget transferred title to a truck their father owned to herself, rather than to their mother as she and Austin discussed.

[21] Gay v. Hartford Underwriters Ins. Co., 1995 OK 97, ¶ 12, 904 P.2d 83 ("If an order sustaining defendant's demurrer to plaintiff's evidence is found to be against the clear weight of the evidence, equity affords the defendant an opportunity to present evidence"). See also Ellis, Oklahoma Appellate Practice § 15:166 ("[W]here the procedural posture requires further proceedings a remand will be necessary. For example, the appellate court cannot render a judgment the trial court should have rendered if a party was deprived of a required opportunity to present its evidence before the trial court" (footnotes omitted)).

 

 

Kane, C.J., with whom Combs, J. joins, concurring:

¶1 I concur with the opinion but write separately to elaborate upon the statutory procedure for a ward to execute a last will and testament. See 84 O.S. § 41.

¶2 The Court of Civil Appeals made the following observation in their opinion: "The fact Velda Rivenburg signed the 2018 Will before a judge and without her daughter being present either at the attorney meeting or in court is compelling evidence that Appellee was not part of the will drafting process." While the absence of the daughter may have been compelling evidence, I write to emphasize that execution of the will in front of the judge was not compelling evidence. In fact, subsection B of the statute provides:

The appointment of a guardian or a conservator does not prohibit a person from disposing of his estate, real and personal, by will; provided, that when any person subject to a guardianship or conservatorship shall dispose of such estate by will, such will must be subscribed and acknowledged in the presence of a judge of the district court. The judge before whom the will is subscribed and acknowledged shall attest to the execution of the will but shall have neither the duty nor the authority to approve or disapprove the contents of the will. Subscribing and acknowledging such will before a judge shall not render such will valid if it would otherwise be invalid. 

84 O.S. § 41(B) (emphasis added).

¶3 Hence, execution in front of a Judge of the District Court was statutorily required, but not compelling evidence.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1987 OK 10, 733 P.2d 407, 58 OBJ 285, 
Dawson v. Tindell
Discussed

 
1988 OK 93, 760 P.2d 174, 59 OBJ 1688, 
Silk v. Phillips Petroleum Co.
Discussed at Length

 
1913 OK 509, 134 P. 650, 39 Okla. 111, 
LYON v. LYON
Discussed

 
1952 OK 408, 250 P.2d 451, 207 Okla 443, 
STAPLETON v. HOLT
Discussed

 
1945 OK 62, 156 P.2d 139, 195 Okla. 180, 
HOWARD v. FIELDS
Discussed

 
1917 OK 284, 166 P. 150, 64 Okla. 56, 
BAILEY v. PRIVETT
Discussed

 
1917 OK 376, 176 P. 529, 74 Okla. 9, 
TIGER v. PECK
Discussed

 
1957 OK 288, 318 P.2d 404, 
HENDERSON v. GIFFORD
Discussed

 
1917 OK 580, 169 P. 873, 66 Okla. 314, 
DIETERLE et al. v. HARRIS et al.
Discussed

 
1919 OK 170, 182 P. 489, 75 Okla. 250, 
LOWRANCE v. HENRY et al.
Discussed

 
1922 OK 222, 207 P. 976, 86 Okla. 268, 
BROWN v. MINTER
Discussed

 
1967 OK 123, 431 P.2d 366, 
IN RE ESTATE OF LACY
Discussed

 
1934 OK 249, 32 P.2d 936, 168 Okla. 302, 
In re SIXKILLER'S ESTATE
Discussed

 
1934 OK 523, 37 P.2d 602, 169 Okla. 497, 
DAVIS v. WALLACE
Discussed

 
1995 OK 40, 897 P.2d 268, 66 OBJ 1417, 
Matter of Estate of Maheras
Discussed

 
1970 OK 135, 472 P.2d 885, 
FLETCHER v. MEADOW GOLD COMPANY
Discussed

 
1995 OK 97, 904 P.2d 83, 66 OBJ 3052, 
Gay v. Hartford Underwriters Ins. Co.
Discussed

 
1971 OK 149, 498 P.2d 1401, 
WHITE v. PALMER
Discussed

 
2002 OK 90, 63 P.3d 9, 
IN THE MATTER OF THE ESTATE OF HOLCOMB
Discussed at Length

 
2007 OK 60, 163 P.3d 557, 
CONAGHAN v. RIVERFIELD COUNTRY DAY SCHOOL
Discussed

 
1924 OK 360, 226 P. 65, 101 Okla. 257, 
STUMPF v. MONTGOMERY
Discussed

 
1925 OK 489, 239 P. 126, 111 Okla. 190, 
ROGERS v. PENNINGTON GROC. CO.
Discussed

 
1927 OK 361, 261 P. 371, 128 Okla. 125, 
GRIFFITH v. SCOTT
Discussed

 
1942 OK 67, 122 P.2d 1007, 190 Okla. 266, 
LOONEY v. BRUIN OIL CORP.
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 577, 
Trial Order
Cited

 
12 O.S. 2007, 
Pleadings Allowed - Form of Motions
Cited

Title 58. Probate Procedure

 
Cite
Name
Level

 
58 O.S. 41, 
Proceedings if Person Contests Will
Discussed

Title 84. Wills and Succession

 
Cite
Name
Level

 
84 O.S. 41, 
Persons Who May Make a Will - Persons Subject to Guardianship or Conservatorship
Discussed

 
84 O.S. 43, 
Procurement of Will or Revocation by Duress, Menace, Fraud or Undue Influence
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA